IN RE JUVENILE APPEAL (ANONYMOUS)

COTTER, C. J., BOGDANSKI, PETERS, HEALEY and PARSKEY, Js.

Argued May 7—decision released August 5, 1980

*Richard P. Nevins,* for the appellant (defendant).

*Richard T. Couture,* assistant attorney general, with whom, on the brief, was *Carl R. Ajello,* attorney general, for the appellee (plaintiff).

*Mark S. Steier,* for the minor child.

BOGDANSKI, J.  This is an appeal from the action of the trial court in terminating the defendant's parental rights in her son pursuant to the provisions of § 17-43a of the General Statutes on the ground that there was "no ongoing parent-child relationship" and that "to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child."[1]  From the judgment rendered, the defendant has appealed.

---

[1] "[General Statutes] Sec. 17-43a.  TERMINATION OF PARENTAL RIGHTS OF CHILD COMMITTED TO COMMISSIONER.  (a) In respect to any child committed to the commissioner of children and youth services . . . the commissioner . . . may petition the court for the termination of parental rights with reference to such child . . . . The superior court upon hearing and notice . . . may grant such petition upon finding that over an extended period of time, which,

The sole issue on appeal is whether the trial court's conclusions are supported by reliable and relevant evidence. The defendant's principal contention is that evidence regarding the availability and suitability of the Bs as adoptive parents was irrelevant to the termination of parental rights.

"The termination of parental rights is defined as 'the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent . . . .' General Statutes § 45-61b (g). It is 'a most serious and sensitive judicial action.' *Anonymous* v. *Norton,* 168 Conn. 421, 430, 362 A.2d 532, cert. denied, 423 U.S. 935, 96 S. Ct. 294, 46 L. Ed. 2d 268 (1975). 'Although that ultimate interference by the state in the parent-child relationship may be required under certain circumstances, the natural rights of parents in their children "undeniably warrants deference and, absent a powerful countervailing interest, protection." *Stanley* v. *Illinois,* 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 [1972]; see *In re Appeal of Kindis,* 162 Conn. 239, 240, 294 A.2d 316 [1972]; *Cinque* v. *Boyd,* [99 Conn. 70, 82, 121 A. 678 (1923)].' *Anonymous* v. *Norton,* supra, 425.

except as hereinafter provided in this subsection, shall not be less than one year . . . (4) there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child."

The statute alternately provides for termination of parental rights if the parents consent, if the parents have abandoned the child, if the parents have failed to achieve a degree of personal rehabilitation that would allow them to assume a responsible position in their child's life, or if the parents, because of continuing physical or mental deficiency, will be unable to provide the child with necessary care, guidance and control. None of these alternate grounds is at issue in this case.

See *Alsager* v. *District Court of Polk County, Iowa,* 406 F. Sup. 10, 22–24 (S.D. Iowa 1975), affirmed, 545 F.2d 1137 (8th Cir. 1976)." *In re Juvenile Appeal (Anonymous)* v. *Commissioner of Children & Youth Services,* 177 Conn. 648, 671, 420 A.2d 875 (1979).

The record reveals the following facts: The defendant is the mother of two children, a daughter born March 24, 1972, and a son born March 24, 1975.[2] The defendant, with the assistance of various social agencies, cared for her son for his first eight months. During this period she had him admitted to the hospital on six occasions for no apparent medical reason, and continued her disruptive relationship with her children's alcoholic father.

On December 12, 1975, both children were committed to the care and custody of the commissioner of the department of children and youth services (hereinafter DCYS) as uncared for children with the consent of the defendant. The son was placed in the home of Mr. and Mrs. B where he remained until December of 1976 when he was removed at the Bs' request because the Bs had become attached to the boy and recognized the fact that at that time there was no possibility that they would be able to adopt him. The son was subsequently placed with the F family.

In June of 1977, after five changes of residence in a one-year period, the defendant returned to live with her mother. During the period from December, 1976, through July, 1977, the defendant kept less

---

[2] The defendant married the children's father on May 28, 1976. Their marriage was dissolved on May 2, 1978. The father has not appealed from the judgment terminating his parental rights in his son.

than one-half of her scheduled visits with her son; she also continued her long-standing relationship with his father.

In July of 1977, the commissioner filed a termination petition as to both children. Doctor D. Mantell, the clinical psychologist who had evaluated the case in connection with the 1975 neglect petitions, reevaluated the case and recommended that the defendant's daughter be returned to her for a six-month reconciliation period and that the son's relationship with his family not be encouraged "since he is a more difficult child, has a poorer prognosis in [the] family as a male and because he has a tenuous psychological bond with his family of origin." Mantell also found no evidence of any psychological bonding between the child and the defendant. The defendant herself acknowledged that "[my son] doesn't know who his real mother is."

While Mantell found that between November of 1975 and September of 1977 the defendant had "improved demonstrably," he also found that many of her long-standing problems had continued: He found her obsessive, compulsive, prone to anxiety, bogged down with details, naive, angry, childlike, and unclear as to conventional social roles. In his opinion, as the children grew older, the defendant's immaturity would become an increasing handicap. He found her vulnerable to stress and therefore prone to make desperate attempts to get help, often inappropriately, and to make unrealistic demands for support. He doubted there would be much change in the future since these traits had characterized her for many years and would be likely to increase under stress. He found that any male child

would be at high risk in this family with its history of alcoholic males and discord between the females involved, namely, the defendant and her alcoholic mother. An abortive return to his mother's home would only exacerbate any existing feelings of rejection. Mantell concluded that if all went smoothly with the defendant, with no unforeseen trauma, stress or financial burdens, she would be able to provide minimally for her daughter, but if the son's foster parents, who had become his psychological parents, were willing to adopt, then termination would be the best alternative for him.

Based upon Mantell's recommendations, the parties on October 31, 1977, agreed to a three-month continuance, leaving the question of the defendant's visitation with her son up to DCYS.

In November of 1977, the F family asked that the defendant's son be removed because of their own family problems. He was then again placed with the B family who, while aware that there was no assurance that they would be able to adopt him, knew that a termination petition was pending. In April of 1978 DCYS withdrew its termination petition regarding the daughter but resumed its case concerning the termination of parental rights in the son.

Because the defendant's primary therapist, Ms. Ingraham, a psychiatric social worker, testified extensively as to the defendant's improvement and predicted her ability eventually to care for both children, the court asked Mantell to reevaluate the situation, this time including the B family, and to consult with Ingraham before making his final recommendation. Mantell subsequently concluded: "[The son's] situation differs from that of his sister

in several critical ways. He entered foster care much earlier in life, has remained in foster care longer, has had a more consistent foster care experience, has developed a strong psychological bond with his foster parents, Mr. and Mrs. [B] . . . who he regards as his mother and father, and shows no particular understanding for the position of [the defendant] in his life . . . . As the examiner feels that [the son] requires continuity and permanence in his home life, it is recommended that this can best be achieved by terminating [the defendant's] parental rights . . . ."

Ingraham admitted basing her contrary recommendation solely on her relationship with the defendant and could not take into account the needs of the son whom she had never evaluated. Testimony of DCYS staff members and Mrs. B confirmed Mantell's conclusion that a viable parent-child bond existed between the son and the Bs and that no such bond existed between the defendant and her son.[3]

The commissioner of children and youth services in petitioning to terminate parental rights in the absence of consent must allege and prove one or more of the statutory grounds set forth in § 17-43a. The statutory criteria must be strictly complied

[3] When the son visited the defendant on May 31, 1978, he did not respond to her overtures, staring at her blankly when she asked "who am I?" His response on the same visit to a total stranger was more receptive than to his mother. Mrs. B reported markedly regressive behavior the next day—defecating in his clothes, tearing the wallpaper, and demanding excessive attention. When he visited the defendant in June of 1978 he did not appear to recognize her and did not initiate any contact with her. Furthermore, Dr. Mantell observed during his June 16, 1978 evaluation that the son avoided all contact with his mother and clung to the Bs during most of the session. When asked to identify the people in the room, the child identified only Mr. & Mrs. B as his father and mother.

with before termination can be accomplished and adoption proceedings begun. *In re Juvenile Appeal (Anonymous)* v. *Commissioner of Children & Youth Services,* supra.

It is clear that the legislature intended that even without fault on the part of the parent a child should be able to be freed for adoption where there is no ongoing child-parent relationship and where the period of time predictably necessary to establish or reestablish a parent-child relationship with the natural parent would be detrimental to the child's best interest. As this court has recognized, however, it is essential, in considering a petition to terminate parental rights, to sever completely the issues of whether termination is statutorily warranted and whether a proposed adoption is desirable. Only if a ground for termination exists may the suitability and circumstances of adoptive parents, in an appropriate proceeding, be considered. *In re Juvenile Appeal (Anonymous)* v. *Commissioner of Children & Youth Services,* supra.

In this case, the evidence presented by the commissioner in support of the petition to terminate clearly satisfied the statutory requirement of establishing the absence of an ongoing parent-child relationship between the defendant and her son for more than one year.

In *In re Juvenile Appeal,* supra, 670, we said: "It is reasonable to read the language of 'no ongoing parent-child relationship' to contemplate a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence it has now been completely displaced.

In either case the ultimate question is whether the child has no present memories or feelings for the natural parent." The fact that the defendant had some contact with her son between December 12, 1975, when he was committed to the care and custody of the commissioner of DCYS, and October 13, 1978, when her parental rights were terminated, does not preclude a determination that there has been no ongoing parent-child relationship for a period in excess of one year.

Furthermore, the evidence clearly supports a determination that to allow time for the development of such a relationship, that is time for the defendant to meet "on a day to day basis the physical, emotional, moral and educational needs" of her son, would be detrimental to his best interests. In reaching this conclusion, since the best interests of the son are controlling,[4] evidence as to the son's relationship with his foster parents and their availability and suitability as adoptive parents is clearly relevant.

There is no error.

In this opinion COTTER, C. J., PETERS and HEALEY, Js., concurred.

PARSKEY, J. (dissenting.) Because today's decision puts in jeopardy the fundamental rights of parents, especially those of limited means who must rely on the state to some extent in providing care for their children, I feel compelled to express my contrary views.

---

[4] The court found that "[t]o remove [the son] from this foster home where he had spent more than half his life, or to further delay the permanency which he requires would be clearly inconsistent with his best interests."

The commissioner of children and youth services in this case originally sought to terminate the defendant's parental rights in her two children. The petition was withdrawn with regard to the older sister who has since been returned to the defendant mother. The petition to terminate parental rights in the younger brother was brought on three grounds, namely, (1) that the defendant had "failed' to achieve any such degree of personal rehabilitation as would reasonably encourage the belief that at some future date [she] could assume a responsible position in [her] child's life"; (2) that the defendant "by reason of continuing physical or mental deficiency [has], and for such period of time as will be detrimental to the best interest of the child, will be unable to provide him with the care, guidance and control necessary to his physical, educational, moral and emotional well-being"; and (3) that "[t]here is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or re-establishment of such parent-child relationship would be detrimental to the best interest of the child." The court found against the commissioner on the first two grounds but for him and against the defendant mother on the ground of the absence of an ongoing parent-child relationship pursuant to General Statutes § 17-43a (a) (4). Although the court observed that the improvement shown in the defendant's health, appearance, ability to resist the disruptive influence of the child's putative father and self-confidence were all indicative of the possibility that she might some day be capable of parenting her son,

the court nevertheless proceeded to deprive her permanently of that possibility. We thus have the anomalous situation of a family unit destroyed with no hope of reconstruction on the basis of "no ongoing parent-child relationship." Although the real mischief lies in the slippery language of the statutory ground itself, the facts in this case do not justify the result.

We must examine the "no ongoing parent-child relationship" ground for termination in light of the defendant's constitutional right to preserve her parental rights in the absence of a powerful countervailing state interest. *Stanley* v. *Illinois,* 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972). Section 17-43a (a) (4) authorizes the termination of parental rights upon proof of no ongoing parent-child relationship for a period of one year. It is not enough for the commissioner to show a troubled relationship or even no meaningful relationship. Parental rights may be terminated only by showing no relationship. *In re Juvenile (Anonymous)* v. *Commissioner of Children & Youth Services,* 177 Conn. 648, 670–71, 420 A.2d 875 (1979). "While the evidence may demonstrate that the relationship was a troubled and confused one that had been adversely affected by the separation from the natural mother and by the intervening formation of a new relationship between the child and his foster parents, the relationship had by no means ended." Id., 670–71. Because the issue has not been raised I do not address the question of the constitutional validity of § 17-43a (a) (4). Cf. *Davis* v. *Smith,* 266 Ark. 112, 583 S.W.2d 37 (1979). But in view of the constitutional right protected, any statute which permits termination of parental rights upon a showing of anything less than a compelling

state interest would not pass constitutional muster. Note, "The Right to Family Integrity: A Substantive Due Process Approach to State Removal and Termination Proceedings," 68 Geo. L.J., 213, 214 (1979).

Although the trial court found no ongoing parent-child relationship without specifying its duration the majority nevertheless interpolates the required one-year duration in the judgment. The trial court found that the defendant did not visit her son with sufficient regularity to form any significant psychological or parent-child bond with him. The fact that the defendant consistently verbalized concern for her son, sought revocation of the child's commitment and visited him on fourteen occasions from December, 1976, through July, 1977, is ignored as being of no consequence. The majority characterizes these visits as mere contacts, too insignificant, presumably, to warrant serious consideration.

The decision in this case will make child care placement a trap for the unwary. The child is first removed from the parent and placed in a foster home. The onus is then placed on the parent to maintain a relationship with the child which will satisfy the selected psychiatrist and the trial court that a significant psychological bond exists between parent and child, all at the risk of losing parental rights permanently. Through this subtle process the burden of establishing no ongoing parent-child relationship for a period of one year has been removed from the commissioner. In its place the parent must show that his or her contacts with the child are sufficiently significant to satisfy the trier that a psychological bond continues to exist between parent and child. I find this turnaround incredible.

The real mischief contained in the "no ongoing parent-child relationship" ground can be seen in the invidious comparisons it fosters between the natural parents and the prospective adoptive parents. The trial court's conclusion in this respect is enlightening: "While at the first hearing in October, 1977, [the defendant's son] was not living with prospective adoptive parents so that his best interests would not then have been served by terminating his mother's parental rights, a year later, living with foster parents who had become his psychological parents and who were willing to adopt, such termination was in his best interests." Although we said in *In re Juvenile Appeal (Anonymous)*, supra, that the best interests of the child is not an ingredient and is not involved in the threshold question of termination of parental rights the court's decision today speaks otherwise. I dissent.