[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Nature of Proceedings
On July 27, 1990, after 26 continuous months in foster care, Tyrell K, born October 17, 1987, became the subject of this petition by which the Department of Children and Youth Services (DCYS) seeks to terminate the parental rights of his mother and sole legal guardian, Gwendolyn K. (Gwen), alleging three of the four nonconsensual grounds for such action as set forth in subsection (b) of Sec. 17-43a of the Conn. Gen. Stats. Rev. 1989 applicable to children previously committed, as was Tyrell on April 28, 1989, to DCYS:
 1. Abandonment 2. Failure to rehabilitate 3. Absence of parent-child relationship with detriment to the child if further time allowed to establish or reestablish such relationship.
The third ground was added by oral amendment at the initial hearing on the petition at the same time that a further nonconsensual ground (denial of care due to parental acts of commission or omission), originally pleaded, was withdrawn. A psychological evaluation was ordered on motion of the petitioner, and at a pretrial conference of October 4, 1990 a firm trial date of December 17, 1990 was set. All sides rested at the end of that trial date and were given to January 11, 1991 to present oral summaries of their clients' positions. The attorney acting as counsel and guardian ad litem for the child was given an additional two weeks in which to present his position so that the period of reserved decision commenced on January 25, 1991.
Facts
Evidence offered at trial, interpreted in the context of the prior record in this court concerning this mother and five of her six older children, supports the finding of the following facts;
Tyrell K. was born October 17, 1987, exactly one year after this court had rendered its decision terminating Gwen's parental rights in two of Tyrell's six older siblings, such rights in a third sibling having been terminated five months earlier in May of 1986. The mother's history prior to CT Page 3367 his birth is set forth in the opinion of the Connecticut Appellate Court affirming this action of the trial court. In Re Shavaughn K. et al, 13 Conn. App. 91 (1987), cert. denied207 Conn. 805 (1988), Appendix attached. During her pregnancy for Tyrell, Gwen had continued abusing alcohol and intravenous injection of cocaine, (State's Exhibit B in neglect proceeding, March 14, 1989, discharge summary), having admitted to the hospital social worker using cocaine immediately prior to delivery. (Id., Social Work Note dated October 20, 1987). Nonetheless, because the child was well and the mother's interaction with him appropriate, he was released to her care a week after birth.
When he was six months old, however, his mother was hospitalized on an emergency basis with pneumonia and a hip infection. Hospital staff at the time noted her alcohol withdrawal, recent track marks on her arm and evidence of hallucinations. She was admitted on May 3, 1988, leaving Tyrell behind with a 17-month old brother, Claude M., in the care of the acknowledged father of Claude, Albert M. Four days later, Tyrell and his brother were brought to the hospital after Claude had injected a quantity of iron pills and Tyrell found with "Filthy hair, clothes, diaper and strong body odor . . ." (Id., note of May 9, 1988). Albert was seen by admitting staff as a "Grandfather . . . hardly able to take care of himself." (Id.) Since Albert M. declined to resume Tyrell's care when ready for discharge from the hospital on May 13, 1988, he was placed in a DCYS foster home with the permission of his mother.
Gwen remained in the hospital for over a month after her son's discharge but returned to the hospital 10 days later with ". . . almost complete obliteration of the joint space" in her right hip. (State's Exhibit C, neglect trial, March 17, 1989). There was noted to be further destruction of the joint since an X-ray taken on May 9, 1988. When discharged to a shelter on June 28, 1988, she was given a follow-up appointment with an orthopedic specialist to pursue the prognosis that "ultimately however total hip replacement would have to be performed." (Id., note of June 26, 1988).
In August of 1988, three months after his voluntary placement in foster care, since Gwen continued to be unable to care for him due to her homelessness (she had moved from various shelters into a single furnished room) and physical disability, DCYS, acting in accordance with long established administrative policy regarding voluntary foster placement, filed a petition alleging him to be uncared for and neglected, and at the same time seeking to terminate his mother's parental rights. These petitions were dismissed for technical reasons on CT Page 3368 November 8, 1988 and simultaneously refiled and personally served on her on that date. At that point, having now spent six months in foster care, Tyrell had seen his mother only twice, both times when the foster mother had transported him to her home for the visit. admitted that her son had been neglected and that her continuing medical needs precluded her caring for him, thus rendering him uncared-for. With the agreement of all parties, the pending termination petition was dismissed without findings or prejudice, and on April 28, 1989 Gwen agreed to Tyrell's commitment to DCYS for an initial period of 18 months, later extended by agreement pursuant to Sec. 46b-129, subsection (e). With the advice of counsel, Gwen acknowledged the court's expectations for reunification with her son which included cooperating with DCYS, visiting the child as often as DCYS permitted; following the recommendations of the Clark Clinic for counselling; maintaining adequate housing; and complying with her own medical treatment. She was also expected to refrain from substance abuse and further involvement in the criminal justice system. These expectations were embodied in a subsequent service agreement executed by Gwen and the DCYS social worker on July 21, 1989. (State's Exhibit C). In this Gwen agreed to visit her son twice a month on her own, while the social worker agreed to transport her for a third visit each month. Although the child was placed in Hartford, within walking distance of the mother and convenient to bus transporation, the social worker also agreed to provide Gwen with taxi money "as long as mother's hip is still giving her problems." (Id.)
Attempts at reunification
In the fifteen months between Tyrell's commitment and the adjudicatory date for this petition (July 27, 1990), Gwen obtained adequate housing and the only evidence of continuing substance abuse was a single instance when a scheduled visit was aborted after the social worker observed Gwen to be under the influence of alcohol. The three primary expectations, however, for visiting, counselling, and securing medical care for herself, were wholly unfulfilled:
Visitation — Of the 36 visits contemplated to take place in the year following execution of the service agreement on July 21, 1989, only five took place and on every occasion the social worker had transported Gwen for the visits. Eleven additional scheduled visits were cancelled by the mother because of illness. On one occasion (May 26, 1989) the social worker found Gwen "in no condition" for a visit. Gwen later admitted drinking beer when upset over a personal problem. (Testimony of social worker Hudson, December 17, 1990). On another CT Page 3369 occasion (November 2, 1989) the social worker arrived unannounced and Gwen refused to let her in. Visits were to be suspended in September of 1989 so that Gwen could have hip replacement surgery but on the day she was to be hospitalized, surgery was cancel led when Gwen revealed her pregnancy with an eighth child who was born the following spring. To facilitate Gwen transporting herself for visits to the foster home located a short walking distance from where she lived, DCYS arranged for supplementary checks to be issued for taxis. A check sent in January of 1990 was reported stolen, but investigation established that it had been endorsed with her name and cashed. A February 1990 check was sent and not reported as stolen but it, too, produced no visits to the foster home. Consequently, taxi money was withheld after February 1990.
Counselling
Although agreeing in court on April 28, 1989, and in the subsequently executed service agreement on July 21, 1989, that she would engage in counselling at Clark Clinic and abide by its recommendations, this never took place. An initial attempt to establish regular counselling ended in the early fall of 1989 after Gwen had cancelled a number of appointments over the summer, expressing her desire to discontinue. (See DCYS report to court September 25, 1989). A subsequent case conference attended by Gwen and her attorney reiterated the need for counselling, and a new social worker from the Clark Clinic, Rose Norman, was assigned to Gwen's case. Ms. Norman agreed to visit Gwen at her home twice, and thereafter Gwen agreed to come to the clinic, DCYS providing for medical cabs in view of her physical disability and pregnancy. Ms. Norman went to Gwen's residence four times; Gwen did not come to the clinic at all. Two specific appointments to do so were cancelled, transportation never being offered as the excuse. In January of 1990, Ms. Norman closed the case for noncompliance. In her testimony of December 17, 1990, Ms. Norman stated that the case would have been kept open had Gwen attended even once, but in view of her total noncompliance, coupled with her repeated statements that she neither needed nor believed in counselling, there was no purpose served by keeping an open case. In Ms. Norman's opinion, Gwen deliberately erected obstacles to reunification with Tyrell (such as avoiding counselling) because of her serious concern about her own ability to care for him in view of her many problems.
Attendance to her own medical needs
Gwen was recommended for hip surgery after her hospitalization in June of 1988, when the rapid progression of her hip degeneration was noted. Nothing was apparently done in CT Page 3370 furtherance of such treatment until the fall of 1989 when the operation was scheduled but cancelled due to her becoming pregnant for the eighth time. After that child was born in May of 1990, Gwen did nothing to secure any kind of treatment for herself until more than three months after the institution of this action.
Clinical evaluation
The court-ordered clinical individual evaluation of Gwen could not take place at the time scheduled for it since Gwen, following an interview which had included Tyrell, insisted on leaving early, expressing to the psychologist her fear that the place where the evaluation was being conducted was "full of devils" which made her baby (then three months old) cry. (State's Exhibit A, p. 1) Tyrell was observed interacting little with his mother and evidencing no sign of recognizing her. (Id., p. 3) "The child preferred everybody in the room over the mother." (Id.) Dr. Mantell concluded that there was "no evidence of an ongoing relationship between Tyrell and the mother" and found Tyrell's foster mother for the preceding 17 months to be his psychological parent. This was consistent with the conclusions of a different clinical psychologist who had evaluated mother and son 18 months earlier in connection with the neglect proceeding.
Despite her premature departure from the evaluation session, Dr. Mantell was able to draw conclusions from his interview with her and the child, in the light of her history and prior evaluations. He found ". . . that her stress tolerance is low, that she is prone to magical thinking and self-preoccupation . . ." (Id., p. 7) and he recommended termination of her parental rights so that Tyrell could have a permanent home after nearly two and a half years of being a foster child.
In his testimony of December 17, 1990 Dr. Mantell described Tyrell's behavior when with his mother as "clearly avoidant", in contrast to the close attachment displayed in interaction with his foster mother. Just as the other psychologist had observed no parent-child relationship between Tyrell and his mother in March of 1989, Dr. Mantell also found none 18 months later not surprising in view of the infrequent contact between them during that period. Considering the history of her care of Tyrell's six older siblings, all of whom were presently in the care of others, Dr. Mantell found it "unlikely" that there would be any benefit to this child to wait longer than he already has in the hope of reunifying with his mother. On the contrary, Dr. Mantell found the caretaking "limbo" in which Tyrell had lived for all but CT Page 3371 the first six months of his life "inherently an unhealthy condition for the child and one that should be avoided." Whatever distance existed between mother and son at the time of the evaluation in September of 1990 could only have been aggravated by the time of trial with the passage of another three months without contact. The child's greatest need, after two and a half of his three years as a state ward, was for a permanent home without further delay. Dr. Mantell added that he had concern for Gwen's ability to care for any child entrusted to her for a long period.
Adjudication — on facts existing on the adjudicatory date
(July 27, 1990)
1) Abandonment — While ten visits in 15 months might preclude a finding of abandonment at common law, it does not constitute a "reasonable degree of interest, concern or responsibility" as to the welfare of this child sufficient to defeat a finding of abandonment as that term is defined in Sec. 17-43a, subsection (b). Gwen's mobility was limited by her hip problem that she did nothing to rectify. When sent money for taxi transportation to the foster home, it was not used or that purpose. From the child's point of view a mother seen five times in a year, a dozen times in more than two years, (see In Re Saba P., 13 Conn. App. 605 (1988), is an abandoned child. This constitutes clear and convincing proof of this alleged ground for terminating her parental rights.
2) Failure to rehabilitate — When committed to DCYS in April of 1989, Gwen was physically disabled to the point of being unable to care for this child. Fifteen months later, while having secured adequate housing, she remains unable to care for this child. In fact, she has been unable even to visit him more than on the average of once every six weeks despite living within walking distance of his foster home. Her decision to conceive, carry to term and assume care of an eighth child makes the challenge of caring for Tyrell even greater than it was when he was committed. She has failed to engage in counselling of any kind, persisting in her assertion that she does not need any counselling and does not find it beneficial. On the adjudicatory date she was thus farther from being able to take care of Tyrell than she was — by her own admission — on the date of his commitment.
For the purposes of this ground, it is immaterial that to a large extent her inability to care for Tyrell is due to physical or psychological disabilities over which she has little or no control: CT Page 3372
 Under Sec. 17-43a, however, the trial court's obligation is not to make an unguided investigation of the respondent's "fault" in determining whether to grant a petition to terminate parental rights, any more than its disposition is intended to reflect some kind of moral judgment respecting a parent whose rights are terminated. Nor may this court invalidate the statutory criteria of Sec. 17-43a merely because that criteria may in some instances implement the legislature's judgment that parental rights should be terminated despite the fact that a particular parent, with the best intentions, personally may be incapable of overcoming deficiencies in parenting skills.
In re Luis C., 210 Conn. 157, 168-169 (1989).
Further, whether Gwen will ever be able to raise this, or any child, is not the issue. What this court must determine is whether, on July 27, 1990, after her child had been more than two years in foster care, Gwen had achieved "such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, . . . [she] could assume a responsible position in the life of the child." Considering Tyrell's age and needs, the time when his mother would be able to assume a responsible position in his life is in the remote future, if ever. See In Re Davon M., 16 Conn. App. 693 (1988); In re Rayna M., (13 Conn. App. 23 (1987). This constitutes clear and convincing proof of this nonconsensual ground for terminating her parental rights in this child.
3) Lack of parent-child relationship — In March of 1989, 10 months after his initial foster placement, Tyrell displayed no parent-child relationship in an evaluation conducted by clinical psychologist Dr. Bruce Freedman. Eighteen months later Dr. David Mantell discerned no sign of such relationship between parent and child — an outcome that was not surprising considering that only ten visits has taken place in the interim. Tyrell was last in his mother's care at the age of six months. Whatever parent-child relationship then existed was disrupted when Gwen was hospitalized, leaving him to be cared for by the elderly father of his half sibling. Four days later, evidencing many signs of physical neglect, he was placed in the custody of DCYS where he remained for over two years. It can only be a matter of speculation as to what memories a child of two and one-half might retain of a parent who last cared for him when he was six months old, and whom he has seen only a dozen times since. Based upon the interaction observed by Dr. Mantell, Tyrell displayed even less of an emotional tie with his mother than he did for the evaluator or state social CT Page 3373 worker.
In In Re Juvenile Appeal (Anonymous), 181 Conn. 638
(1980), a unanimous Supreme Court upheld this ground for termination in the case of a mother separated from a son whom she had visited fourteen times in seven months. In citing that case with approval, the Supreme Court recently stated:
 . . . the evidence in that case established that the child, who was three and one-half years old at the time of the termination hearing and who had been separated from his mother since the age of eight months, did not appear to recognize his natural mother when she visited, did not respond to her overtures, appeared to avoid her, and identified only his foster parents as his father and mother. Such evidence, we concluded, justified the trial court's determination that no parent-child bond existed, despite the fact that the mother had maintained contact with her son through visitation.
In Re Jessica M., 217 Conn. 459, 469 (1991). These words could apply equally here: Tyrell, who was two and one-half years old at the time of the termination hearing, had been separated from his mother since the age of six months. In the clinical evaluation he did not appear to recognize his mother as anyone more connected to him than the professionals who were present, and clearly identified only his foster mother as his parent, despite the fact that his mother had maintained sporadic contact with him through visitation for over two years. This is clear and convincing proof that whatever relationship exists between Tyrell and his mother, it is not a parent-child relationship as defined by the statute. That fact alone, of course, is not ground to terminate a parent's rights. The court must also find that to permit further time for the establishment or reestablishment of such relationship would be detrimental to the child. The only clinical evidence in this record unequivocally compels the conclusion that there would be serious detriment to the child to withhold permanency longer than the two and one-half years that he has already been denied the assurance of a permanent home. Even if the foster mother cannot adopt this child — and the evidence in this record suggests that she can and will — Dr. Mantell recommends adoption by strangers as preferable to waiting still longer for Gwen to become able to resume his care. The petitioner has thus provided clear and convincing proof of this third nonconsensual ground for terminating her parental rights.
Disposition — on facts as of final trial date, 12/17/90: CT Page 3374
In the nearly five months between the adjudicatory date and the date of trial, Gwen did little to suggest that reunification with Tyrell could take place in the foreseeable future. She requested that taxi money be reinstated to facilitate visits. Checks were sent to her for this purpose in October and November of 1990 but visits again were not forthcoming. She repeated to the newly assigned social worker that she did not want to participate in counselling, that she had no need for it and she did not benefit from it. (Testimony of social worker Gerber, December 17, 1990). In early October Gwen called the new social worker and threatened to kill her and the psychologist who had evaluated her several weeks earlier. Alarmed by this call and the sound of Gwen's youngest child screaming in the background, the social worker visited Gwen and found her in a condition unlike her usual condition: Eyes glassy, speech rapid, motions frantic, extremely angry. During these five months, Gwen engaged in no formal treatment but several times a week saw a drug counsellor who happened to live in her building. He testified that while he had never seen her appearing to be under the influence of drugs or alcohol, it was difficult to determine drug abuse with casual contacts. On October 23, 1990, after the psychological evaluation and a pre-trial conference at which a trial date of December 17, 1990 had been set, she consulted an orthopedic resident physician who prescribed a lift in one shoe (Respondent's Exhibit 1) to compensate for a marked leg-length discrepancy. He testified that after the lift was used regularly for three months he would be able to determine if it was adequate to alleviate her pain in walking, although such procedure would do nothing to affect the underlying condition. He made an appointment for January 22, 1991 for this purpose. Gwen, however, did not have the prescription for the lift filled until December 7, 1990 (Respondent's Exhibit 2). The doctor testified that the January appointment would now have to be postponed since six weeks of using the lift would be insufficient to determine its effectiveness. While hip replacement can be used to repair the underlying problem of bone degeneration which produced the discrepancy in leg length and resulting pain and disability, it may not be an available option for pregnant women or intravenous drug users. Thus, Gwen's compliance with the expectations that had been agreed to in April of 1989 as preconditions for reunification with Tyrell, except for having obtained shoe-lifts ten days before trial, was essentially unchanged.
Gwen did not testify on her own behalf, or offer any witness other than her current neighbor (the drug counsellor) and the orthopedist who had seen her in October of 1990. CT Page 3375
Before a court may consider terminating a parent's rights, it must consider the six factors set forth in subsection (d) of Sec. 17-43a:
(1) Services have been offered to Gwen to facilitate her reunion with her children since the outset of state intervention in 1983. The first petitions seeking to terminate her parental rights in Tyrell were withdrawn in April of 1989 in view of her expressed willingness, embodied in written expectations in the court file and later in a written service agreement executed with the DCYS social worker, to visit regularly, to attend to her own medical treatment (since it was her physical problems that precipitated Tyrell's placement in foster care in May of 1988), and to follow the recommendations for counselling that would be made by the Clark Clinic. DCYS offered to provide transportation two out of three times scheduled for each month, and later provided money for taxi transportation for the short (walking) distance from her home to the foster home. Notwithstanding her expressed intentions, her medical needs were not addressed, she visited on the average of once every month and a half, instead of the more than once every week and a half that had been agreed upon. Erratic behavior and ideation was noted as recently as September, during the psychological evaluation which Gwen terminated because of "devils" in the building, and October when she called DCYS and threatened to kill the evaluator and the social worker. Given her steadfast refusal to engage in counselling, which caused the Clark Clinic to close her case twice in a year, her belated and superficial attention to her increasing physical disability, and her inability to traverse even a short distance by taxi to visit her son, there would appear to be no further services that could be provided.
2) While neither the court's expectations of April 28, 1989 nor the service agreement Gwen signed on July 21, 1989 are court orders, they are undertakings which she agreed were calculated to unable her to resume care of her son. Other than securing adequate housing and remaining free of further criminal court involvement, there has been substantial noncompliance. Three essential terms of those agreements — regular visits, seeking medical attention for her physical disability and engaging in counselling — have not been fulfilled. CT Page 3376
3) Dr. Freedman in March of 1989 and Dr. Mantell in September of 1990 found no suggestion of a parent-child relationship between Tyrell and his mother. In fact, the child appeared more interested in interacting with everyone in the room (including the psychologist, the social worker and the foster mother) other than the mother. On the other hand, Tyrell is clearly bonded to his foster mother with whom he has lived continuously for eighteen months and who is committed to caring for him indefinitely.
4) Tyrell, as of the dispositional date, had just turned three. He has not been in his mother's care since he was six months old. He is at an age when permanency of caretaking is critical for his future development. Whether the present foster mother is permitted to adopt, or whether he is to be adopted by strangers, he can no longer continue as an impermanent foster child, waiting indefinitely for a mother who has lost custody of all but the youngest of her eight children over the course of the last few years, and whose inability to secure physical and psychological help for herself in the past appears unlikely to change in the foreseeable future.
5) Since Tyrell's placement in foster care in May of 1988, Gwen has managed to stay out of prison and has secured adequate housing. She has done nothing else to make it in Tyrell's best interest to return to her care in the foreseeable future: She has not visited him with the frequency or regularity which was expected by the court and promised by the mother, despite extraordinary assistance provided by DCYS. She has not secured the medical care for her hip problem that apparently renders her incapable of going out of her own home for either visiting or counselling. She has kept in touch with DCYS and her whereabouts have always been known to the agency responsible for Tyrell's care, but she has not utilized its suggestions for her rehabilitation.
6) The only circumstances which have prevented Gwen from maintaining a meaningful relationship with Tyrell were of her own making: Instead of arranging the hip surgery which had been recommended in 1988, she chose to have another child, rendering such procedure impossible. She did nothing else, even to alleviate her own pain in walking, until the trial of this matter CT Page 3377 had been scheduled, and then did not have the prescription for the orthotic device filled for nearly two months, until 10 days before trial. Her only contacts with counsellors at the clinic were when the counsellors came to her house; Gwen did not manage to go to the clinic for a counselling session even once, although provided with money for a medical cab. This is consistent with her constantly reiterated statements to a variety of professionals that she does not need counselling and could not benefit from it. Considering the foregoing factors and the unrefuted clinical testimony in this record, it is found by clear and convincing evidence to be in the best interests of this child for his mother's parental rights to be terminated so that he may know at last the security of a permanent home. It is therefore ORDERED that the parental rights of Gwen K. in and to her son Tyrell K. be, and hereby are, terminated. And it is further ORDERED that the (Commissioner of DCYS be appointed statutory parent for the purpose of placing the child forthwith in adoption. Said Commissioner is also ORDERED to submit to this court in writing a report as to the progress toward such adoption no later than 90 days following the entry of this judgment, and thereafter in such forms and at such frequency as the court may from time to time require. If the child's adoption is not finalized on or before July 1, 1992, the said Commissioner is ORDERED to submit to this court a motion to Review Plan For Terminated Child in conformity with the requirements of Federal law.
Appeal
The mother has 20 days from the date of this judgment in which to seek an appeal. If, after being informed by trial counsel of the court's judgment and the right to take an appeal, she affirmatively manifests a desire to do so, it such trial counsel is willing to act in that capacity, the court will appoint him for this purpose. If she manifests a desire to take an appeal, and if trial counsel declines to represent the mother because in his professional opinion it lacks merit, such attorney is not required to do so but may file a timely motion to withdraw and to extend time in which to take an appeal. The court will then appoint another attorney to review this record who will, if willing to represent the mother on appeal, be appointed for this purpose. If the second attorney determines that there is no merit to an appeal, he or she is requested to make this known to the court at the earliest possible moment, and the mother will be informed by the clerk forthwith of the balance of the extended appeal period in which CT Page 3378 to secure her own counsel who, if qualified, may be appointed to represent her on the appeal. If this is not done, then upon expiration of the extended appeal period, the right to pursue an appeal will be ended and the termination of parental rights final. The child will at that time, and not before, be free to placed in adoption.
If such procedures satisfy the sixth amendment right to counsel in criminal cases (Douglas v. California, 372 U.S. 353
(1963); Fredericks v. Reincke, 152 Conn. 501 (1965)), they are even more appropriate where there are interests of a third party involved: Those of children whose need for permanent safe parenting is entitled to at least as great a degree of consideration as are those of the parent whose right to raise them is at issue. Even unsuccessful appeals delay permanent planning for years since no child may be adopted until the appellate process is exhausted. The need for finality of judgment in cases where the state initiates legal action against indigent respondents, which gave rise to the rule of Douglas and Fredericks, supra, applies as much or more to cases where the person affected by the judgment is a young child for whom passage of periods of time that may seem short for adults can work changes with lifetime implications.
Entered at Hartford this 2nd day of April, 1991.
Brenneman, J.
APPENDIX A
December 22, 1987 CONNECTICUT LAW JOURNAL. Page 33A -------------------------------------------------------------------------
13 Conn. App. 91 91 -------------------------------------------------------------------- In re Shavoughn K. --------------------------------------------------------------------
 IN RE SHAVOUGHN K. ET AL.* (5205)
DUPONT, C.J., BIELUCH and NORCOTY, JS.
On appeal by the respondent mother from the trial court's judgment terminating her parental rights with respect to three of her minor children, held that the trial court did not err in its determinations, made with respect to the statutory (17-43a) grounds for termination, that the respondent had abandoned the children and had failed to rehabilitate herself so as to encourage the belief that she could assume a position of responsibility in their lives, nor did that court err in its CT Page 3379 determination that termination was in the children's best interests.
Argued September 29 — decision released December 22, 1987
Petitions by the commissioner of children and youth services to terminate the parental rights of the respondent mother with respect to three of her minor children, brought to the Superior Court in the judicial district of Hartford-New Britain, Juvenile Matters at Hartford, and tried to the court, Brenneman, J.; judgment terminating the respondent's parental rights, from which the respondent appealed to this court. No error.
Margaret P. Levy, for the appellant (respondent mother). Patricia Lilly Harleston, assistant attorney general, with whom, on the brief, were Joseph I. Lieberman, attorney general, and Robert G. Garvey, assistant attorney general, for the appellee (petitioner). William L. Ankerman, for the minor children. ------------------------------------------------------------------------- * In accordance with the spirit and intent of General Statutes 46b-142
(b) and Practice Book 2026, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court. Reporter of Judicial Decisions Page 34A CONNECTICUT LAW JOURNAL December 22, 1987
------------------------------------------------------------------------
92 13 Conn. App. 91
---------------------------------------------------------------------- In re Shavoughn K. ----------------------------------------------------------------------
NORCOTT, J. This case involves an appeal from the granting of three separate petitions for the termination of the respondent mother's parental rights brought pursuant to General Statutes 17-43a by the commissioner of the department of children and youth services (DCYS). The respondent mother claims that the trial court erred in concluding (1) that she had abandoned her youngest child, Shavoughn, (2) that she had failed to rehabilitate herself with respect to all three children, and (3) that the termination of her parental rights was in the best interests of the two older children, Lekila F. and Shante K. We find no error. CT Page 3380
The respondent moved to Connecticut as a young child and, except for a brief period of residence in New York, she has remained in this state. She has never been able to secure a permanent address in her own name. Her living arrangements have always been at the convenience or charity of family and friends. She has been repeatedly arrested and after reaching the age of sixteen years has been in and out of our state corrections institutions during much of her adulthood. The respondent also has a history of substance abuse. As of the date of the hearings on the petitions she had given birth out of wedlock to five children, the three youngest of whom are the subjects of this appeal, and before the completion of the dispositional hearings she was pregnant with a sixth child.
DCYS first became involved with this family in June, 1983, when the respondent was arrested for repeated failures to appear in connection with pending larceny charges. The first action taken by DCYS was to place all five children in state licensed foster homes. Two months later, DCYS filed petitions alleging that the respondent's children were uncared-for and neglected. On March 24, 1984, upon the respondent's admission that she was unable to provide them with a home during her incarceration, the children were adjudged to
December 22, 1987 CONNECTICUT LAW JOURNAL Page 35A ------------------------------------------------------------------------
13 Conn. App. 91 93 --------------------------------------------------------------------- In re Shavoughn K. --------------------------------------------------------------------- be uncared-for in the sense of being homeless, but no findings were made on the allegations of neglect. Disposition of the matter was deferred until the respondent was released from Niantic Correctional Center where she had been incarcerated.
The dispositional hearing was held on August 1, 1984, after the respondent had been transferred to the Watkinson Halfway House in Hartford. At the dispositional hearing, the respondent agreed to the commitment of all five of her children with the expectation that they would be returned to her should she meet certain expectations or preconditions set by the court for their return. These conditions were (1) that she follow the requirements of her probation, (2) that she secure adequate housing, (3) that she engage in counseling, (4) CT Page 3381 that she apply for city welfare or otherwise secure an income for herself, and (5) that she visit the children regularly. Subsequent to her release from the halfway house, the respondent moved in with her sister on a temporary basis.
Two months after the initial commitment the respondent had attended only one of four scheduled counseling sessions; none of the other conditions had been met. Nonetheless, in October of 1984, the two oldest children, who are not subjects of this appeal, were returned to the respondent with the understanding that Lekila, age three years at the time, could conditionally begin overnight stays. The record reveals that the respondent had no contact with either Shante, age two, or Shavoughn, age one, during this period.
The respondent finally filed for AFDC, pursuant to the conditions set forth by the court, a few months after the court's order of August 2, 1984. Her application had not been acted upon by January, 1985, however, when the respondent was forced to leave her sister's home after an altercation. Without any financial support Page 36A CONNECTICUT LAW JOURNAL December 22, 1987
------------------------------------------------------------------------
94 13 Conn. App. 91
--------------------------------------------------------------------- In re Shavoughn K. --------------------------------------------------------------------- for housing from any source, the respondent left the two older children in the care of her sister who had been approved by DCYS as a foster parent. DCYS again urged the respondent to engage in counselling, specifically with respect to the follow-through needed to secure housing and resources required for the return of her children.
DCYS then lost contact with the respondent for some period of time. When it reestablished contact, the respondent was living in the apartment of an unrelated older man. As this living arrangement was by the respondent's own assessment inappropriate for the children, she did not attempt to regain custody at this time. She continued to visit Lekila on an infrequent basis, but had no contact with Shavoughn or Shante.
In July of 1985, the respondent was returned to Niantic for a violation of probation. During this incarceration, CT Page 3382 DCYS began to develop long term planning services for the two youngest children. Shavoughn, Shante and Lekila were residing with foster parents at this time. Upon the respondent's release from prison she returned to live with the older gentleman.
During the year preceding the filing of the termination petitions, the history of the respondent's contact with the three children who are the subject of this appeal varied as to each child. The respondent visited the baby, Shavoughn, only once during this period even though she lived within walking distance of Shavoughn's foster home. This was true even though no limitations or restrictions were ever placed on visitations or phone calls. Her explanation was that visitation was too emotional an experience.
With respect to Shante, the respondent's situation was somewhat different. Shante's foster mother disallowed visits at her home and she had an unlisted phone number. Additionally, the record reflects that,
December 22, 1987 CONNECTICUT LAW JOURNAL Page 37A ------------------------------------------------------------------------
13 Conn. App. 91 95 --------------------------------------------------------------------- In re Shavoughn K. --------------------------------------------------------------------- unbeknownst to DCYS, Shante's foster mother moved to a different address. Faced with these obstacles, the respondent was instructed to arrange visitations through DCYS. The respondent, however, did not request visitations with Shante during this period. With regard to Lekila, the record reveals that the respondent did occasionally visit, but overall her contact with the child was minimal.
It is clear from the record that during the entire period of the childrens' DCYS commitment the respondent engaged in infrequent counseling. By her own testimony, she felt that counseling was particularly ineffective, and expert evidence revealed doubt that the mother's problems could significantly improve with counseling. This same evidence showed clearly that the prognosis for the respondent's success as a responsible parent suited to handle the needs of her children would be negative without counseling.
On October 7, 1985, DCYS filed the petitions for termination CT Page 3383 of parental rights that are the subject of this appeal. Each petition alleged that the respondent's parental rights should be terminated pursuant to General Statutes 17-43a (a). On May 7, 1986, at the first dispositional hearing on these petitions, the trial court found that the petitioner had proven by clear and convincing evidence that the respondent had abandoned the youngest child, Shavoughn. In reaching its decision, the court relied on the expert testimony of a clinical psychologist who testified that because of the very young age of Shavoughn, the child's inability to relate to or recognize the respondent as his biological or psychological parent, and the respondent's failure to maintain even minimal contact with the child, no parent-child relationship existed between the respondent and Shavoughn. Page 38A CONNECTICUT LAW JOURNAL December 22, 1987
------------------------------------------------------------------------
96 13 Conn. App. 91
--------------------------------------------------------------------- In re Shavoughn K. --------------------------------------------------------------------- The court also found that the petitioner had sustained its burden of proving that the respondent had failed to rehabilitate herself within the meaning of General Statutes 17-43a as to all three children. With respect to the two girls, Lekila and Shante, the court deferred final action for a three month period to determine whether it would be in the best interests of the two girls to terminate the respondent's parental rights. The court concluded, however, that it would be in the best interests of Shavoughn to terminate the respondent's parental rights immediately. Accordingly, the petitions for termination were granted as to Shavoughn at that time.
At the second dispositional hearing on October 7, 1986, the trial court finally concluded that the mother's situation had remained basically unchanged, and it terminated her parental rights to Lekila and Shante also.
 I
The respondent's first claim is that the trial court erred in concluding that she abandoned her youngest child, Shavoughn. We do not agree.
"The termination of parental rights is defined as `the CT Page 3384 complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and parent. . . .' [General Statutes 17-32d (e) (formerly 45-61b (g))]." In re Juvenile Appeal (Anonymous), 181 Conn. 638, 640, 436 A.2d 290
(1980). It is "the ultimate interference by the state with the natural rights of parents in their children, resulting in an everlasting severance of the legal relationship, and usually the separation of parent and child as well . . . ." In re Migdalia M., 6 Conn. App. 194, 203,504 A.2d 532, cert. denied, 199 Conn. 809,508 A.2d 770 (1986). Accordingly, our legislature has provided by statute that parental rights are not to be terminated except upon clear and convincing evidence that (1)
December 22, 1987 CONNECTICUT LAW JOURNAL Page 39A ------------------------------------------------------------------------
13 Conn. App. 91 97 --------------------------------------------------------------------- In re Shavoughn K. --------------------------------------------------------------------- termination is in the best interest of the child, and (2) one or more of the statutory grounds for termination exists. General Statutes 17-43a (b). Strict adherence to the statutory criteria is required. In re Migdalia M., supra.
One of the statutory grounds for termination set forth in General Statutes 17-43a (b) is abandonment of the child. As we noted in In re Migdalia M., supra, "a petition for termination of parental rights may be granted if the court finds `upon clear and convincing evidence,' that a parent has `abandoned the child in the sense that [the parent has] failed to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare.' [General Statutes 17-43a (b)(1).] Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of a child. In re Luke G., 40 Conn. Sup. 316,323 A.2d 1054 (1985). Where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred. In re Juvenile Appeal (Docket No. 9489),183 Conn. 11, 438 A.2d 801 (1981)." In re Migdalia M., supra, 208-209.
The record in this case clearly supports the trial court's decision that statutory abandonment has CT Page 3385 occurred with respect to Shavoughn. Shavoughn was taken from the respondent when he was only three weeks old. In the fourteen months that followed, the respondent made only two visits and two telephone calls to Shavoughn's foster home. This was true even though the foster home was within easy walking distance of where the respondent was staying and the respondent was free to telephone or arrange visits directly, without going through DCYS. The respondent fails to point to any evidence that controverts the trial court's finding, based on these facts, that she failed to display any Page 40A CONNECTICUT LAW JOURNAL December 22, 1987
------------------------------------------------------------------------
98 13 Conn. App. 91
--------------------------------------------------------------------- In re Shavoughn K. --------------------------------------------------------------------- "interest, concern or responsibility" for the welfare of Shavoughn. Accordingly, we find that the trial court's decision is legally correct and factually supported. In re James T., 9 Conn. App. 608, 617, 520 A.2d 644
(1987).
 II
The respondent's second claim is that the trial court erred in concluding that she had failed to rehabilitate herself. 1 We do not agree.
General Statutes 17-43a (b)(2) allows the trial court to terminate parental rights when the parent has "failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of a child, [she] could assume a responsible position in the life of the child." In determining whether the parent has failed to rehabilitate herself to the extent that she could assume a responsible role in her children's lives, the court must consider the six factors listed in General Statutes 17-43a (d); see In re Rayna M., 13 Conn. App. 23,31-32, A.2d (1987). Those factors are: "(1) [t]he timeliness, nature and extent of services offered or provided to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) the terms of any applicable court order entered into and agreed upon by any individual or
--------------------------------------------------------------------- CT Page 3386 1 The respondent asserts this claim for all three of her children. We review it, however, only as it affects the termination of her rights to Lekila and Shante. We have long held that in order to satisfy the statutory requirements for elimination of parental rights, DCYS need only prove by clear and convincing evidence one of the statutory grounds provided in General Statutes 17-43a (b). In re Juvenile Appeal (84-BC), 194 Conn. 252,258, 478 A.2d 1204 (1984); In re Migdalia M., 6 Conn. App. 194,504 A.2d 532, cert. denied, 199 Conn. 809, 508 A.2d 770
(1986). Our holding that abandonment was properly proven as ground for termination of the respondent's parental rights to Shavoughn precludes our review of this alternate claim of error as it affects Shavoughn.
December 22, 1987 CONNECTICUT LAW JOURNAL Page 41A ------------------------------------------------------------------------
13 Conn. App. 91 99 --------------------------------------------------------------------- In re Shavoughn K. --------------------------------------------------------------------- agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (3) the feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (4) the age of the child; (5) the efforts the parent has made to adjust his circumstances, conduct, or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (6) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent." General Statutes 17-43a (d).
In this case, the respondent failed to do anything which would encourage the belief that she could ever assume a responsible position in her children's lives. The trial court offered her counseling services, but the respondent exhibited a complete disdain for counseling, attending only one of the several scheduled sessions.[2] CT Page 3387 Furthermore, while no court orders were ever --------------------------------------------------------------------- [2] The respondent claims that the trial court erred in using her failure to attend counseling sessions as a basis for terminating her parental rights. She claims that because of certain personality disorders counseling would be totally ineffective for her. She argues that requiring her to attend counseling is a violation of her rights to due process of the law and equal protection of the laws as guaranteed by both the state and federal constitutions because it is in essence asking her to do something she cannot do because Page 42A CONNECTICUT LAW JOURNAL December 22, 1987
------------------------------------------------------------------------
100 13 Conn. App. 91
--------------------------------------------------------------------- In re Shavoughn K. --------------------------------------------------------------------- issued in this case, the trial court repeatedly spelled out the expectations the respondent was expected to fulfill in order to resume care of the children: Avoid problems with the criminal courts; secure adequate housing; and visits the children regularly. The respondent was unable to meet the first two expectations and achieved only token compliance with the last. We find nothing in the record to support the respondent's contention that she had become a parent capable of assuming a responsible position in her children's lives.
 III
The final claim raised by the respondent is that the trial court erred in concluding that termination of her parental rights with respect to Lekila and Shante was in the best interest of the children. Again, we do not agree.
The record reveals that the children have lived in foster homes for more than half their lives. They have seldom seen their natural mother and have developed no real ties to her. Given these facts and the fact that the respondent has shown neither the inclination nor the ability to be a responsible parent, we uphold the trial court's finding that termination was in the best interests of the children. In re Juvenile Appeal (Anonymous)181 Conn. 638, 646, 436 A.2d 290 (1980).
There is no error.
In this opinion the other judges concurred. CT Page 3388
--------------------------------------------------------------------- of her mental status. We note first, that this argument was never raised in the trial court. We note also that on appeal the defendant makes no more than a bare assertion of her constitutional rights. She provides absolutely no authority supporting her argument. Accordingly, we refuse to consider her claim at this time. Bourman [Bowman] v. 1477 Central Avenue Apartments, Inc., 203 Conn. 246, 249-50 n. 3, 524 A.2d 610 (1987).