[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
After spending all of his then 19 months of life in the same foster home, Lawrence S., on November 23, 1990, became the subject of this petition by which the Department of Children and Youth Services (DCYS) seeks to terminate the parental rights of Inez S., his mother and, lacking a named father, sole legal guardian so that he may achieve a permanent home in adoption. The petition alleges a single ground for the relief sought, pursuant to Sec. 17-43a of the Conn. Gen. Stats. (Rev. 1990; now Sec. 17a-112, Rev. 1991): The absence of a parent-child relationship and the detrimental effect upon the child of allowing still further time for such relationship to be established.
Inez appeared at the initial hearing on December 18, 1990 with her attorney and her maternal grandmother, Mattie S., who was appointed guardian ad litem in view of her minority, notwithstanding the presence of a representative of her legal guardian, DCYS, in the court. Following the entry of a contested plea, the matter was continued to obtain a psychological evaluation by the same psychologist who had interviewed Inez two years earlier in connection with her own commitment to DCYS when she was pregnant with Lawrence. At the conclusion of trial on April 26, 1991, all parties rested, waiving the right to file trial memoranda.
Testimony offered at trial, interpreted in the light of the prior record in this court concerning both Lawrence and his minor mother, of which judicial notice is taken, supports the the finding of the following facts:
Inez was born March 18, 1974 to a 15-year old retarded CT Page 5521 mother. After being physically and sexually abused by her stepfather, Inez was placed in foster care in Georgia at the age of nine. After two years, she, her mother and two other siblings, were brought to Connecticut with the help of her maternal uncle in 1985. Soon after, her mother became involved with a boyfriend who sexually abused Inez. When the alleged abuse was confirmed by a diagnosis of venereal disease when Inez was 12 years old (State's Exh. A and B, neglect trial re Inez, 6/9/87), DCYS intervened. After trial, Inez was found to have been both neglected and abused, and pursuant to Sec.46b-129(d) she was placed in the custody and guardianship of her uncle, with whom she had lived since October of 1986. Two years later, now pregnant at the age of 14, her uncle asked DCYS to place her in foster care while he and his family moved out of state. On March 30, 1989, two weeks before giving birth to Lawrence, Inez was committed to DCYS and has remained a ward of the State of Connecticut through the time of this trial.
In the evaluation conducted in October of 1988, psychologist Dr. Bruce Freedman, found Inez to be ". . . strikingly naive about sex and pregnancy," having "never heard of birth control." (State's Exh. A., second neglect proceeding re Inez, 3/30/89, p. 1.) Nonetheless he found her then to possess ". . . a good basic understanding of child care." Despite her testing in the mildly retarded range (full scale I.Q. of 61), and coming from a neglectful family background, her experience in caring for children of relatives and her positive attitude toward her impending motherhood caused the evaluator to recommend that she be given an opportunity to learn how to parent her baby by being placed at St. Agnes/Lourdes Home where she could learn by watching others.
Lawrence was born on April 14, 1989, six months after Inez had been placed in the DCYS licensed foster home of B.N. In June of 1989, DCYS filed a petition alleging Lawrence to be uncared-for since his mother, then 15 and a state ward was unable to provide him with a home due to her minority, retardation and legal status. On August 22, 1989, with the assistance of counsel, Inez agreed to the allegations of the petition and to the commitment of her son to DCYS, upon the representation that Lawrence would remain in the B.N. foster home with his mother. No mention was made of Dr. Freedman's recommendation for institutional care for mother and child, the presumption being that Inez could learn childcare skills from the experienced foster mother.
From the time of her son's birth until she left the foster home eight months later, Inez attended school, assisted the foster mother in child care, and accompanied the child on all medical appointments when she was not in school. Reflecting on CT Page 5522 this period, B.N. testified that she had tried to teach Inez every aspect of basic baby care and while "she did the best she could", she did not "seem interested in a lot of things." (Testimony of B.N.). Many times she appeared not to have remembered earlier instructions, and at the time she moved out in January of 1990, B.N. did not feel that Inez could have cared for the baby on her own.
Chafing against the restrictions of the B.N. foster home, Inez decided to move out, leaving Lawrence behind. From January to May of 1990 she moved from relatives to a shelter and in mid-May, notwithstanding its knowledge that Inez's maternal grandmother had a chronic history of alcohol abuse (State's Exh. B., first neglect trial re Inez, 6/9/87), DCYS placed Inez with Mattie S., and delayed formulating a permanent plan for Lawrence in order to explore Mattie's offer to become his legal guardian.
When Inez first left the foster home, her plan had been to give permission for B.N. to adopt Lawrence. Her visits with her son rapidly decreased in frequency and in quality over the following year: From several visits a week, contact decreased to twice a month, then monthly, and by the end of 1990 Inez was visiting less than once a month. By the time of trial (4/26/91) Inez had not seen her son for three months. She never telephoned B.N. between visits, never asked for help with transportation, and was never refused the opportunity to visit. Later asked why she stopped visiting her son regularly and frequently, she told Dr. Freedman that during the week it was school work and on weekends she had to do her washing, concluding, "I go over there if I don't have anything to do." (State's Exh. A., p. 2). Mattie S., whose offer to become the guardian of her great-grandson had delayed formulation of a permanent custodial plan for many months, had visited the child twice since his birth (Id., p. 4): Once in April and again in August of 1990. During Inez's visits to her son, she spent much of her time interacting with the foster mother's daughter, frequently leaving the house with her while leaving her son behind. (Testimony of B.N.).
While she had originally expressed a willingness to have B.N. adopt Lawrence, after living away from the foster home she began to express the desire "maybe" to keep the baby. (Testimony of social worker Sampson). The social worker then referred her to the program recommended earlier by Dr. Freedman and arranged a preplacement visit there in the spring of 1990. Notwithstanding the knowledge that Lawrence could have been placed with her had she entered that program, she declined to participate in it. CT Page 5523
Inez did not testify in her own behalf but called an uncle and Mattie to testify for her. The uncle stated that Inez was permitted to baby sit for his three young children in his home, but never for more than eight hours at a time. Mattie offered her home to Lawrence, as well as to the baby whose birth Inez was expecting in August of 1990, but testified that she did not believe Inez to be capable of caring for any child without help from another adult. She agreed with Dr. Freedman's assessment that when Inez was with Lawrence, "he doesn't even know his mother." (Testimony of Mattie S.). Mattie described a visit she and Inez had had in the foster home when Lawrence ran away from his mother: "I told her to reach for him and she just stood there watching TV." (Id.) A variety of excuses was offered by the relatives for the infrequency of visitation: Inez and her grandmother (according to the uncle who was present for a single visit) felt uncomfortable after a visit when the grandmother had picked the child up with no preparation, and, when he cried uncontrollably, the foster mother had retrieved him saying, "He don't know you." (Testimony of uncle.) Neither Inez nor her grandmother requested off-premises visits, and in her own testimony Mattie did not give "discomfort" in foster home visits as the reason why months had passed without visitation, but rather only stated that she had been "busy".
Dr. Freedman, who before Lawrence's birth had recommended giving Inez the chance to learn child care so that she might be able to care for him on her own some day, recommended fifteen months later that no further effort be made. In his evaluation of January/February, 1991, he found her full scale I.Q. score had risen to the upper end of the mild retardation range, due either to her continuing academic education or the administration of a different test (Exh. A., p. 1.) He found nothing, however, ". . . which suggested that Inez was currently capable of caring for Larry or that she would show this capability in the near future." (Id. p. 9.) Indeed, she did not offer herself as Lawrence's sole caretaker but rather ". . . wanted him to be with her extended family." (Id., p. 2.) Dr. Freedman concluded that she:
 . . . showed a lack of interest and bond with Lawrence . . . little explanation for her move away from her son or her lack of visitation . . . [and] little evidence of attachment to her son, or of a commitment to take care of him. (Id.)
In a joint interview, Lawrence began to scream loudly immediately upon being picked up, without any preliminary preparation, by his mother: "Inez had no idea of what to do and took no action to comfort him in any way" (Id.) The CT Page 5524 psychologist found the child's behavior with Inez to be ". . . in striking contrast" to his behavior with B.N., her daughter, and even with the evaluator himself:
 There was no sign of any established relationship between Lawrence and Inez . . . [and] obviously no parent-child bond between the two. (Id., p. 3.)
In contrast, Lawrence and the foster mother ". . . showed excellent interaction" and he seemed "happy, comfortable and secure with her." (Id., p. 5.)
 There was no doubt that . . . [she] was `mommy' to Larry and that she was an excellent mother. (Id.)
Mattie S. failed to keep her appointment with Dr. Freedman and, when it was rescheduled, gave a variety of confused excuses for her failure. Although not formally tested, she appeared to Dr. Fredman to be "estimated to be in the mild range of mental retardation", as was her daughter and granddaughter. She gave a history that was vague and confused, ". . . often missing the significance of issues discussed." (Id. p. 7.) The evaluator concluded that Inez had chosen to live with her in order to avoid the restrictions in the B.N. foster home, and after doing so her school attendance deteriorated, she stopped taking birth control pills, was again pregnant, and her visits with Lawrence decreased still further. From this he concluded that Inez's grandmother
 . . . did not seem capable of caring for Inez or for a young child. She would not be considered an acceptable caretaker for Lawrence, nor an acceptable supervisor of Inez's maternal care. (Id., p. 7.)
Dr. Freedman recommended termination of Inez's parental rights and adoption without further delay, preferably by B.N., based upon the lack of relationship between Lawrence and his mother, or with any member of her family, and Inez's failure to do anything to improve her parenting capability:
 Even if she were interested and committed to Lawrence's care, Inez showed serious mental limitations and personal problems which would put any child in her care in serious danger of neglect or substandard care. (Id., p. 8.)
Adjudication — on facts as of 11/23/90 when this petition originated CT Page 5525
No amendment was offered to update the pleadings following the original filing of this petition on November 23, 1990. As of that date, the petitioner has established, by clear and convincing proof, the sole ground pleaded for terminating Inez's parental rights. The foster mother and the great-grandmother gave accounts of Inez's interactions with her son that were remarkably similar to Dr. Freedman's: The child reacts more positively to strangers (e.g. Dr. Freedman himself) than to his mother. Despite eight months of example-setting by B.N. while Inez was in the same foster home, she appeared to retain little if anything of what she had been taught concerning ways of handling Lawrence that would not upset him. Even during the eight months that Inez lived in the same home with the child, it was B.N. who provided principal care, with Inez assisting when not otherwise occupied. Inez elected to leave the home where she was living with her son, refused a residential placement where he could have been placed with her, visited with decreasing frequency, and candidly acknowledged that she only goes to visit him when "I don't have anything to do." It is thus not surprising that Dr. Freedman found "no sign of any established relationship between" them, a "no parent-child bond between the two." This constitutes clear and convincing proof that there exists between Inez and her son no ongoing parent child relationship which is defined as "the relationship that ordinarily develops as a result of a parent having met on a continuing, day-to-day basis the physical, emotional, moral and educational needs of the child", in the existing statutory language. None of the witnesses, whether called by petitioner or respondent, testified to seeing in Lawrence any evidence of positive feelings for, memories of or emotional ties with his mother of a significance that would defeat the conclusion that no such parent-child relationship presently exists. Compare In Re Jessica M, 217 Conn. 459 (1991). The fact that Inez visited once a month, or more, in the months preceding the filing of this petition does not, per se, preclude the finding of this statutory ground for termination. In Re Juvenile Appeal, Anon.,181 Conn. 638 (1980). The lack of such parent-child relationship alone, however, is not sufficient for the termination of a parent's rights. The court must also find, by equally clear and convincing proof, that ". . . to allow further time for the establishment or reestablishment of the parent-child relationship would be detrimental to the best interests of the child." In the year and a half since Lawrence was placed in the B.N. foster home immediately after birth, Inez has gradually decreased her involvement with him, electing to move out of the home in which she was living with him, declining placement in a facility that would have accepted both her and her child, and even at present is offering not herself but her own grandmother — whose interest in Lawrence is suggested by her two visits to him in the first nineteen months of his life CT Page 5526 — as an alternative to a permanent home with B.N. On this record, considering Inez's retardation, history of emotional trauma and evident inability to learn and apply ordinary childraising skills, it is both clear and convincing that to allow more than the nineteen months that has already elapsed in the hope of establishing or reestablishing a parent-child relationship, would only be detrimental to the best interests of this particular child.
Curiously, DCYS did not check that box on the printed form of the termination petition that would indicate that a second ground existed for terminating Inez's parental rights: Failure to rehabilitate. The pleadings themselves, however, and all of proof provides overwhelming evidence that Inez, the parent of a child found to have been uncared for in a prior proceeding, has failed ". . . to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the child", she could assume a responsible position in the life of this child. This constitutes a second ground for terminating Inez's parental rights. The ultimate test of this ground is to compare the parent's position, vis-a-vis being capable of caring for the child at the time of commitment with that position on the adjudicatory date of a subsequently filed termination position. In the instant case, Inez was no closer to being able to be Lawrence's principal caretaker in November of 1990 than she was when her son was committed to DCYS fifteen months earlier. Indeed, her situation in this regard has significantly deteriorated: In August of 1989 Inez was living in the same home as Lawrence, being taught on an ongoing basis all of the elements of caring for a young baby by the highly experienced foster mother who was the child's principal caretaker. Had Inez remained in this situation she might have evolved into an adult capable of caring for a child of her own, without the constant supervision of a more competent caretaker. But she chose to leave that home, leaving her son behind, and over the course of the ten months before this petition was filed, separated herself more and more from his company. Visits decreased to less than monthly, and — as ascertained at trial — at about the time this termination petition was filed, Inez, having stopped birth control measures, had again become pregnant out of wedlock. This constitutes clear and convincing proof of this second ground for terminating her parental rights.
Disposition — as of 4/26/91, the final date of trial
Between the filing of this petition and the last trial date, Inez's situation further deteriorated in relation to her son, Lawrence: She is expecting another child in four months. Her school attendance has deteriorated. She is living with her CT Page 5527 retarded grandmother with a history, according to DCYS records, of chronic alcoholism. As of the dispositional date, Inez had not visited her child in three months.
Before a court may terminate a parent's rights it must consider the six factors set forth in subsection (d) of Sec. 17-43a:
(1) DCYS offered the most comprehensive program under which a traumatized 15-year-old retarded mother could learn how to parent: The 24-hour-a-day example of an experienced foster mother entrusted with the care of both mother and child. Inez chose to leave that situation, and when offered an institutional alternative — where she could have resumed living on a daily basis with her son — she refused. She was given unlimited visitation privileges and treated as a member of the foster family. Given her age, intellectual deficits and legal status, no other services could have been offered to facilitate reunion of the child with his mother.
(2) There were no orders issued in this case. The court's expectations at the time of commitment in August of 1989 envisioned Inez continuing to live in the same foster home as her son. When she decided to move out, leaving Lawrence with the foster family, none of these expectations could be fulfilled.
(3) Dr. Freedman painted a vivid picture of the feelings and emotional ties of this child with his mother, as contrasted with his lifetime foster mother. He clearly has established significant emotional ties with the latter, and is disturbed by the unempathetic efforts of his mother and her relatives to make contact with him on infrequent visits.
(4) Lawrence had just turned two on the dispositional date. He has spent his entire life with the B.N. family, which is now committed to him for life and would be willing to adopt him if he is legally freed for adoption. He occupied the same home as his mother for his first eight months of life, but she chose to separate from him at that age. He needs the security of a permanent home with the only parents he has ever known before he gets more deeply into the next phase of his development.
(5) Inez has attempted to stay in school, and has not changed her residence for the preceding eleven months. She has, however, refused a residential program that would have enabled her to live with, and assume primary care of, her son; she has visited him less frequently as time goes by; at 16 she became pregnant with her second child, whose birth is expected in four months. This does not constitute an effort to adjust her CT Page 5528 circumstances, conduct or conditions to make it in the best interest of this child to return him to her home in the foreseeable future.
(6) Nothing has prevented Inez from maintaining a meaningful relationship with her child except her own decreasing contacts with him and her inability to learn ways of relating to him without upsetting him. The fact that B.N. took the screaming child out of the arms of Inez and her relatives when they approached him without necessary preliminaries was not, under these circumstances, an unreasonable act.
Considering the foregoing, as well as the excellent care that Lawrence has received from the foster family who is willing to adopt him, it is clearly in his best interests for his mother's parental rights to be terminated and thus end the possibility of any future disruption of his present stable situation now, before he turns three years old. Even if, through some misadventure, the B.N. family could not adopt him, it would equally clearly be in his best interests to be freed for adoption by strangers rather than to wait longer than his two-year lifetime for his teen-aged, retarded, pregnant mother to become capable of providing him with an adequate home. Therefore, it is ORDERED that the parental rights of Inez S. in and to her son, Lawrence S., be and hereby are terminated. And it is further ORDERED that the Commissioner of DCYS be appointed statutory parent for the purpose of placing the said child forthwith in adoption, and, to ensure this end, such Commissioner is ORDERED to submit to this court a written report as to the progress toward adoption no later than 90 days after the entry of this judgment. If the adoption of Lawrence has not been finalized by September 7, 1992, the said Commissioner is further ORDERED to file a Motion to Review Plan for Terminated Child on or before such date to be in conformity with federal law.
7. Appeal
Inez has 20 days from the date of this judgment in which to seek an appeal. If, after being informed by her trial counsel of the court's judgment and her right to take an appeal, she affirmatively manifests her desire to do so, if her trial counsel is willing to act in that capacity, the court will appoint him for this purpose. If the respondent manifests her desire to take an appeal and if her trial counsel declines to represent her because in his professional opinion it lacks merit, he is not required to do so but may file a timely motion to withdraw and to extend time in which to take an appeal. The court will then appoint another attorney to review this record who will, if willing to represent the mother on appeal, be CT Page 5529 appointed for this purpose. If the second attorney determines that there is no merit to an appeal, he or she is requested to make this known to the court at the earliest possible moment, and the respondent mother will be informed by the clerk forthwith that she has the balance of the extended time to appeal in which to secure her own counsel who, if qualified, may be appointed to represent her on the appeal. If she does not do so, then upon expiration of the extended appeal period, her right to pursue an appeal will be ended and the termination of her parental rights final. The child will at that time, and not before, be free to be placed in adoption.
If such procedures satisfy the sixth amendment right to counsel in criminal cases (Douglas v. California, 372 U.S. 353
1963); Fredericks v. Reincke, 152 Conn. 501 (1965), they are even more appropriate where there are interests of a third party involved: Those of the child whose need for permanent safe parenting is entitled to at least as great a degree of consideration as are those of the parent whose right to raise him is at issue. Even unsuccessful appeals delay permanent planning for years since no child may be adopted until the appellate process is exhausted. The need for finality of judgment in cases where the state initiates legal action against indigent respondents, which gave rise to the rule of Douglas and Fredericks, supra, applies as much or more to cases where the person affected by the judgment is a young child for whom the passage of periods of time that may seem short for adults can work changes with lifetime implications.
Entered at Hartford this 7th day of June, 1991.
Brenneman, J.