[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Nature of Proceeding
Fifteen months after his original placement in the custody of the Department of Children and Youth Services (DCYS), Mark S., Jr., not yet two years old, became the subject of this petition by which DCYS seeks to terminate the rights of Linda R. and Mark S., Sr. (hereafter Mark Sr.), his mother and acknowledged father, alleging three out of the four nonconsensual grounds for doing as set forth in Sec. 17a-112, Rev. 1991) applicable to children committed to the petitioner.
Both parents were served in hand but neither appeared for the initial hearing on Mark Jr.'s second birthday, December 20, 1990. Linda was hospitalized at the time and a plea contesting the allegations was entered on her behalf by the attorney who had represented her in an earlier neglect proceeding concerning this child. A similar pro forma contested plea was entered for the father who was unrepresented. The matter was continued to secure an update of a psychological evaluation by the same clinician who had seen child and parents in October of 1989 in connection with the CT Page 4409 earlier proceeding. Upon receipt of that evaluation, a pretrial conference was held, which neither parent attended, and a trial date set for March 25, 1991. On that date, Linda appeared with her attorney and disclosed that Mark Sr. was presently incarcerated and, therefore, his presence could be secured through a habeas order. The trial proceeded on the appointed date, but only as to the mother, (In Re Jonathan P.,23 Conn. App. 207 1990) and was continued as to the father, as well as for disposition as to both, to April 18, 1991. Although the habeas had been duly served during Mark Sr.'s incarceration, he was subsequently released and failed to appear. At no time did he apply for counsel, either to Legal Assistance to Prisoners when incarcerated or to the court clerk when released, and no appearance was filed in his behalf. The court then proceeded by default in his absence (In Re Bobby Jo. S., 10 Conn. App. 36 (1987)), and rested as to both parents. No evidence was offered by the mother, and all parties were given until April 26, 1991 for the filing of trial memoranda. The period of reserved decision is thus deemed to have begun on April 26, 1991.
Facts
Evidence offered in two days of hearing, interpreted in the light of the prior record in this court concerning the child in question, of which judicial notice is taken, supports the finding of the following facts:
Mark S., Jr. was born out of wedlock on December 20, 1988, the fifth child born to his then 35-year old mother. Four older children, born to her from two dissolved marriages, were all in the custody of others: The first two with their father; the third in adoption; the fourth with paternal grandparents. (State's Exhibit B, p. 3-4.) Mark Sr., six years her junior, had one older child born out of wedlock whom he neither visits nor supports.
Soon after Linda met Mark Sr. in 1985 they began living together. Despite alcohol abuse by both, and repeated physical abuse of Linda by Mark Sr., they remained together for three years before Mark Jr.'s birth, and for the first eight months of his life. DCYS received the first referral on the child on August 9, 1989 when Linda appeared in a hospital emergency room with a severe response to alcohol abuse, accompanied by Mark Sr. and the baby. The referral was from hospital staff concerned with the child's safety. When DCYS investigated, Linda recounted beatings and threats by Mark Sr. and displayed visible bruises from his abuse. She reported that he had struck her while holding the baby, and continued such behavior even after she had obtained a restraining order from the court. CT Page 4410 The child remained with the parents while DCYS pursued the investigation.
Two weeks after the first referral, a second was received when Mark Jr. was found in the care of his father while Linda was hospitalized for alcoholism. Because of the restraining order, the father had been arrested, and while the investigating social worker was waiting in the apartment, a woman emerged from a closet claiming that a few hours after meeting Mark Sr. in a local park, he had asked her to baby sit Mark Jr. while he went out. DCYS proceeded to file a neglect petition and obtained an order of temporary custody (OTC) to ensure the child's safety during his mother's hospitalization. In the hearing on the OTC, both parents appeared and were represented by separate counsel. After a contested hearing, the OTC was sustained. Neither parent appeared at the next scheduled hearing on December 4, 1989 and, by default, the child was found to have been neglected and committed to DCYS for an initial period of 18 months pursuant to Sec. 46b-129. Specific expectations were spelled out for the mother to achieve in order to secure return of the child's custody. These included refraining from substance abuse, domestic violence and further involvement with the criminal justice system, as well as her involvement in alcohol treatment. Ten days following commitment, Linda appeared in court with her attorney and agreed to these expectations, as well as to the additional requirement that Mark Sr. was to have no unsupervised visits with their son when he was with his mother.
For the first 10 months of her son's commitment to DCYS, Linda appeared to be cooperating with the expectations for his return to her care. She had obtained housing and employment and visited her son as often as permitted at the various foster homes where he had been placed during this period. The foster mother who has cared for him continually since May of 1990 reported that the father had never visited, but that Linda visited regularly and was permitted to take the child off premises. While the foster mother had smelled liquor on Linda's breath on a number of occasions, there had been no other signs of intoxication. The foster mother attempted to assist Linda in locating a job, housing, and child care but Linda did not follow through on her suggestions. The visits went well and child showed no adverse reactions from seeing his mother. At the same time, Linda attended AA several times a week, obtaining sign-off sheets to substantiate attendance. Mark Sr. was incarcerated during this period so there were no further episodes of domestic violence. Because of this apparent degree of compliance with reunification expectations, Mark Jr. was returned to his mother on September 24, 1990. It did not come to light until the child had once again been CT Page 4411 removed from her care five weeks later that all had not gone as well during those ten months as had been represented to DCYS:
— Linda had been hospitalized for alcoholic hepatitis from April 26 to May 2, 1990. During that hospitalization she acknowledged a ten-year history of alcoholism, admitting that currently she had been drinking a half-pint of vodka daily. (Child's Exhibit 4, Final Summary.) Despite a history that included two 28-day in-patient admissions for alcoholism in addition to five brief admissions for detox, treatment with antibuse and ongoing attendance at AA. ". . . she is drinking on a daily basis." (Id.) She refused to consider entering another treatment center and was ". . told absolutely that if she drinks at all that it is highly likely that she is going to die." She was discharged with a "guarded prognosis," (Id., Program Notes dated May 2, 1990) which echoed the initial appraisal that her "Short-term prognosis is fair. Long term prognosis is very poor if the patient continues to drink." (Id., Physical examination of April 26, 1990.)
— Despite three restraining orders she had obtained against Mark Sr. in 1989, both parents appeared to be living together in her home on the numerous occasions when the East Hartford Police were called: Linda summoned them to her home on December 13, 1989 when Mark Sr. had allegedly beaten, choked and kicked her; when he trespassed twice in May of 1990; on a third occasion in May when he committed another assault. He had a key to her apartment and she admitted to the police that, notwithstanding the restraining orders, she permitted him to stay there when he was not intoxicated. (Child's Exhibit 2.)
With Mark Sr. still incarcerated, the child was returned to the mother on September 24, 1989. During the next five weeks, the following events took place: Linda stopped working and attending AA meetings. A week after his return, Linda admitted purchasing beer when shopping with the child, but claimed she did so only as a favor to a friend. She brought the child to visit Mark Sr. as soon as he was released from jail in mid-October of 1990. The police were called to the house days later when two men came to the apartment and assaulted Mark Sr. who claimed that one was the man Linda had been dating while he was incarcerated. Linda did not press charges and the investigating police officers noted that "Both parties questioned were uncooperative in giving information concerning the suspects." (Id., complaint sheet of October 15, 1990.) Two weeks later, on November 2, 1990, the police returned at 8:25 in the morning on the report of a woman screaming. They found Linda smelling of beer and admitting to having been drinking earlier that morning. The bruise marks displayed to them by Linda appeared to be old ones. Mark Sr. CT Page 4412 was also present, claiming that he had only come to visit his son and had become upset when he smelled alcohol on the mother's breath. The police found five cans of beer in the refrigerator.
With this report, DCYS removed Mark Jr. the same day. Two days later, on November 4, 1990, the police were again called to the apartment because Mark Sr. had assaulted Linda's new boy friend with whom she was then planning to live. She told the police "that she no longer wants [him] to reside at . . . [her apartment] . . . because of past problems" which including a beating he had inflicted upon her earlier that same morning. (Id., Report of November 4, 1990.) Again the police smelled alcohol on her breath and advised her to give a sworn statement to the police later "when she is sober." Mark Sr. was arrested three times in the ten days that followed, on one of which he stated that he lived at the address of mother's apartment and had a key to it. (Id.)
Shortly after Mark Jr.'s return to foster care, Linda's new boyfriend reported her missing from his apartment, but she was located after four days. On November 27, 1990 Mark Sr., still living in the same East Hartford apartment, was stabbed by a guest with whom he had been drinking for hours but whose name he did not know. Two days later, DCYS filed this petition. The following month both parents admitted themselves as in-patients to ADRC. Linda claimed this had been "just coincidence" and that they were only friends.
 When confronted that this was odd because she blamed him for her child being taken back by DCYS three weeks ago, Linda just short of shrugged her shoulder.
(Child's Exhibit 3, last page.) On December 26, 1990, a month after Mark Jr.'s third removal from his mother's care in the last 16 of his 24-month life, Linda and Mark Sr., after less than a day there, left the ADRC program against medical advice. They left together.
Mark Jr.'s foster mother since May of 1990 testified that initially Linda visited regularly, and was permitted to take the child off premises. While she had smelled liquor on Linda's breath a number of times, she had observed no other visible signs of intoxication. The foster mother had tried to help Linda locate a job, a place to live with her son and child care, but Linda had not followed through on these suggestions. All of the visits prior to his trial replacement with his mother had been with Linda alone since Mark Sr. was incarcerated. After his return to foster care there were no CT Page 4413 visits or contacts of any kind from either parent for three months — including Christmas of 1990 and the child's second birthday. The first three weeks after his return to the foster home, he awoke often, crying from sleep, had tantrums and was aggressive in behavior toward the foster mother and the latter's slightly older child. This behavior subsided during the three months in which no visits took place. Three visits took place between February 15, 1991 and the final day of trial two months later: On February 15, March 1 and March 22, 1991. Both parents appeared on all three occasions, and during and after each visit the child's reaction was visibly negative, with much crying, defiant behavior, prolonged tantrums, refusal to eat. It was necessary for the foster mother or the social worker to stay in the room with the visiting parents so that the child would stop crying enough for the visit to proceed. After the first of these visits he had insisted on having a night light burning in his room, and he made a gesture with his arms across his chest saying, "Man hit me," clearly indicating "man" was his father. After the third visit he was asked if he wanted to see that "man" again, and he replied, "No. Man all gone." When asked about the lady, again he said, "No." (Testimony of foster mother, March 28, 1991.)
Neither parent kept their appointments for reevaluation by Dr. Freedman, the clinical psychologist who had seen the family in October of 1989. Neither called to cancel or to reschedule. (State's Exhibit C.) Having reviewed the history that developed in the 15 months following his first evaluation, he was able to conclude:
 Because of documented alcoholism and behavior problems, lack of treatment or rehabilitation, and lack of interest in or contact with Mark Jr., the parents have demonstrated their lack of ability to parent Mark or rehabilitated [sic] themselves. As with most alcoholics, Linda has "wet" and "dry" phases, alternating between binges or periods of heavy drinking and periods of attempts to cut down. There is no sign of real treatment . . .
(Id. p. 2.)
Adjudication — as of date petition filed (November 29, 1190)
The petitioner has established by clear and convincing evidence the existence of all three of the nonconsensual grounds for terminating the parental rights of both Linda R. and Mark Sr.:
1) Failure to rehabilitate — the pattern of substance abuse CT Page 4414 and domestic violence that led to Mark Jr,'s first placement at the age off eight months had continued unabated to the date this petition was filed. While there was a brief "dry" period for Linda when Mark Sr. was incarcerated, the minute he returned to the community the pattern resumed: Assaults, bruises, visiting police officers — all in the presence of a child not yet two years old. Treatment, often begun, was never continued. Restraining orders were obtained but ignored by Linda as much as by Mark Sr. Housing which Linda had obtained was surrendered to Mark Sr. and, by the time of trial, the residences of both parents was uncertain. Neither parent has achieved ". . . such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in the life of the child." At the adjudicatory date, Mark Jr. was not yet two years old. He had spent a total of only nine of his 23 months of life with his parent or parents. Three times in those nine months he had been suddenly removed from their care after the police were called because of domestic violence and alcoholism to which he had been a witness. Nothing in this record encourages the belief that these parents can ever, much less within a reasonable time considering Mark Jr.'s age and needs, assume a responsible position in his life.
2) The scene witnessed by the East Hartford Police on November 2, 1990, which resulted in the removal of the child for the third time, did not involve a serious physical injury which would constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights. But it does constitute a denial, by reason of parental acts, of the care, guidance and control necessary for the physical, moral and emotional well-being of a two-year old. While that scene alone would not constitute grounds to terminate a parent's rights, when set against the background of this case — which commenced in an identical scene 15 months earlier — it does constitute clear and convincing proof of this second ground for such termination.
3) For five weeks of the two months preceding the filing of this petition, Linda met on a day-to-day basis the physical needs of her son. This, however, had followed a full year during which the child was in foster homes with the father visiting sporadically in the beginning and the mother visiting with greater regularity. Based upon the child's reaction to the resumption of visitation after he had been replaced in foster care and had not seen either parent for three months, it is a fair inference that whatever memories, feelings or emotional ties Mark Jr. has for his parents are entwined with traumatic scenes of violence and vulnerability. For nearly 13 CT Page 4415 of the 14 months preceding the filing of this petition, neither parent had "met on a day to day basis the physical, emotional, moral and educational needs of the child." The brief trial placement with his mother ended with another precipitate removal following a witnessed scene of violence and intoxication. There is nothing in this record that would permit the inference that "to allow further time for the establishment or reestablishment of such parent-child relationship" would be anything other than "detrimental to the best interest of the child." Visitation alone does not preclude the existence of this ground for terminating parental rights. In Re Juvenile Appeal (Anon.), 181 Conn. 638 (1980).
Disposition — on the final day of trial (April 18, 1990)
In the five months between initiation of this action and the dispositional date, the parents' situations remained unchanged: They did not seek any visitation for three months, during which they entered a treatment center, only to leave — together — against medical advice in a matter of hours. Mark Sr. continues his lengthy involvement with the criminal justice system. Neither has stable housing. Linda shows no more signs of being able to separate from Mark Sr. than she did in 1989 when she kept obtaining restraining orders while permitting him access to her home (with his own key). The suggestion that terminating his parental rights while giving her still more time to rehabilitate than the more than 19 months since the child was first removed would appear to be an exercise in futility: There is nothing in this record to suggest than an order terminating his parental rights would be more effective in her exclusion of the father from the life of the child than were the three restraining orders she obtained in 1989.
The present foster family is not an adoptive prospect. Today, while not yet two and one-half and not so emotionally damaged that the passage of time cannot restore him to normal behavior, he is a highly adoptable child. But time will make him less so. To permit more time to pass in the expectation that something might change a pattern of years in either parent would only serve to strengthen his bonds with his impermanent foster parents and make an eventual adjustment to adoptive parents more difficult.
Before a court may terminate parental rights, however, it must consider the six factors set forth in the statute:
(1) All of the services reasonably calculated to effect a reunion of the child with the mother, (or with both parents if the father were to have changed his long-established pattern of CT Page 4416 violence and incarcerations) were offered: Substance abuse counselling was urged and the parents were well-aware of available resources. Visitation was facilitated. Reunion of mother and child was effected after a year of separation — only to abort in five weeks.
(2) The court ordered these parents to submit to a reevaluation by Dr. Freedman; neither went. Expectations were spelled out for the mother in a special hearing set for that purpose soon after commitment. By the dispositional date, nearly all were unfulfilled: Linda had lost her housing; Mark Sr. had been re-arrested; neither was in any kind of treatment program; visiting stopped entirely for three months and, when resumed, had had a traumatic impact on the child.
(3) When visiting resumed in February of 1991, the child's negative response necessitated another adult being present in the room in order for his crying to stop enough for a visit to take place. His reaction at home after these visits — tantrums, aggressiveness, crying — lasted for days. The biological ties appear to have no beneficial effect upon this child who is becoming increasingly attached to foster parents who, unfortunately, cannot adopt him.
(4) Mark Jr. is in a critical stage of his development at not quite two and one-half years old. He needs a secure, predictable, nurturing, permanent home now, before he is old enough to emerge from the closed world of home to the more challenging world of school.
(5) The parents have made little or no effort to adjust their circumstances, conduct or conditions to make it in Mark Jr.'s best interest to return to the home of either parent: Neither has a home, job, or sustained period of sobriety. Their lives continue to be marked by alcohol and domestic violence involving the police, hospitals and jails. During the five months before the child's replacement with his mother on September 24, 1990, Linda appeared to be doing better with Mark Sr. incarcerated. In fact, her drinking continued, untreated, and the moment Mark Sr. was out of prison, her chaotic life with him resumed.
(6) Nothing has prevented either parent from maintaining a meaningful relationship with the child. Insistence on another adult in the room during the visits that took place in February and March of 1991 was not unreasonable given the violence of the child's negative reaction to these visits. Economic circumstances have played no role in the failure of these parents to maintain such relationship with their son. CT Page 4417
Having considered the foregoing, it is found by clear and convincing proof to be in the best interests of Mark S. Jr. for his parents' rights to be terminated so that he may know, without further delay, the security of a permanent adoptive home. Therefore, it is ORDERED that the parental rights of Linda R. and Mark S. Sr. in and to their son Mark S. Jr. be, and hereby are, terminated. And it is further ORDERED that the Commissioner of DCYS be appointed statutory parent for the purpose of placing the said child forthwith in adoption and that such Commissioner shall file with this court 90 days from the date of this judgment a written report as to the progress toward such adoption. If adoption has not been finalized by September 1, 1992, the Commissioner is further ORDERED to submit a Motion to Review Plan for Terminated Child on that date to be in conformity with federal legislation.
Appeal
The parents have 20 days from the date of this judgment in which to take an appeal. If Linda decides to pursue an appeal and her counsel at trial is willing to represent her in it, this court will appoint him to act as appellate counsel at public expense until all appellate process is completed. If, however, in the exercise of his professional judgment as an officer of the Superior Court, he declines to perfect such appeal because, in his opinion, it lacks merit, he is not required to do so but may instead simultaneously file a timely motion to withdraw and another motion to extend the appellate period to the full maximum of 40 days as permitted by law. Such motion, if unopposed, will be granted ex parte and a new attorney appointed to review this record and make an independent determination of the merits of such appeal. If the second attorney determines it lacks merit, he or she is required promptly to submit to the court in writing the reasons for this opinion. The parent will then be informed by the court clerk that there is the balance of the 40 days in which to secure her own counsel for the purpose of taking such appeal, who may, if qualified, be appointed by the court to be compensated by the state. This procedure conforms to the principles of Douglas v. California, 372 U.S. 353 (1963), adopted for Connecticut in Fredericks v. Reincke, 152 Conn. 501
(1965), in which it was held to satisfy an indigent criminal defendant's constitutional right to counsel on appeal if, after the public defender at trial notifies both client and court that "he could not conscientiously proceed with the appeal," another attorney is appointed to consider the merits of the appeal and comes to the same conclusion. Even a convicted criminal defendant "cannot demand that the trial court find and appoint other counsel who will advise such appeal" after the second public defender has declined to do so. Fredericks v. CT Page 4418 Reincke, 152 Conn. at 505. If such procedure satisfies the sixth amendment right to counsel where the only conflicting interests are those of a defendant who seeks review of this conviction and of the state which has a legitimate interest in avoiding the expense and judicial burden of meritless appeals, it is a fortiori appropriate where there are interests of third parties in involved: those of the child whose interest in achieving permanent nurturing parents is entitled to at least as great a degree of consideration as those of his parent whose right to raise him, brought into question because of past acts of omission, is at issue. Even an unsuccessful appeal could delay permanent planning for this child for years since no child may be adopted until the appellate process is exhausted and the termination order final.
If an appeal should be taken, the judgment of termination shall be stayed during its pendency, but throughout this period all decisions made by DCYS, as the child's continuing legal guardian, as to contacts with his natural parents shall be based solely upon the child's best interests, not upon the parents' or upon the lingering possibility of an eventual reunification. Whatever obligation is imposed upon DCYS by federal and state law to make continuing efforts to reunite committed children with natural parents ends upon a judicial finding that grounds exist to terminate parental rights.
Entered this 31st day of May 1991.
BRENNEMAN, J.