[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I. NATURE OF PROCEEDING
On July 22, 1991, after being either in the hospital or foster care his entire life since birth on August 22, 1989, and twenty-one months after being adjudicated as neglected in that he had been denied proper care and attention and was permitted to live under conditions and circumstances injurious to his well-being, Carlos A. became the subject of this Petition. It seeks to terminate the parental rights of Lizette D. and Edwin A., his Mother and and Father, under Section 17a-112 of the Conn. Gen. Statutes (1991), applicable to a child committed to DCYS, alleging, as CT Page 6324 to both parents, abandonment, failure to rehabilitate, acts of commission or omission, and no ongoing parent-child relationship, and that all four grounds had existed for not less than one year.
At the initial plea hearing on August 13, 1991, service of process was confirmed on Mother in hand at Niantic, where she was incarcerated, and on Father in hand at Brooklyn, where he was incarcerated. Both appeared in court with their attorney, and entered denials of the allegations of the Petition. On September 19, 1991, the Court denied Motions to Intervene by both the maternal grandparents, Mr. and Mrs. Raman D., and the foster mother, Ruth W., and further ordered that the adjudicatory and dispositive phases of the trial would be bifurcated.
On January 30, 1992, the Petitioner's Motion To Amend by adding certain factual allegations was granted, and this Motion was filed in writing with the Court on February 6, 1991. Therefore, the cut-off date for facts which can be used in the adjudicatory phase of this case is January 30, 1992. Also, on January 30, 1992, the Court granted the Petitioner's oral Motion To Amend by checking boxes for both parents on grounds 2, 3 and 4 of the Petition.
On February 13, 1992, the Court granted the Petitioner's oral Motion To Amend to change the period of time that the abandonment grounds, the acts of commission/omission grounds, and no ongoing parent-child relationship grounds had existed, to less than one year, and to seek a waiver of the one year requirement for these three grounds.
Trial of the adjudicatory phase took place on January 30, 1992, February 6, 1992 and February 13, 1992. On February 13, 1992, Foster Mother Ruth W's Motion To Intervene was withdrawn, and the maternal grandparents were allowed to intervene in the dispositive phase of the Petition, which was tried on February 19 and March 5, 1992. They (grandparents) were aware of these trial dates, but did not attend, and their attorney agreed to proceed without them. Neither parent attended the trial on February 19, 1992 or on March 5, 1992.
Exhibits 1, 3, 7 and 8 from the adjudicatory phase were made exhibits in the dispositive phase.
II. PRIOR PROCEEDINGS
On August 24, 1989, when Carlos was two days old, DCYS obtained an Order of Temporary Custody and filed CT Page 6325 co-terminous neglect, uncared for and termination petitions for Carlos A., and neglect, uncared for petitions for his three and one year old siblings. All three were adjudicated as neglected on November 2, 1989, and guardianship of all three was transferred to their maternal grandparents, Mr. and Mrs. Ramon D., residents of Puerto Rico. None of the children went to Puerto Rico, and on February 1, 1990, the transfer of guardianship to the maternal grandparents was revoked and all three children were committed to DCYS for up to eighteen months.
On June 26, 1990, DCYS filed a termination petition as to Carlos A. only. On October 4, 1990, DCYS filed termination petitions as to both Carlos A's siblings.
On June 18, 1991, the Court extended the commitment of all three children to DCYS, effective August 1, 1991. On July 18, 1991, DCYS withdrew the termination proceedings as to all children, but refiled as to Carlos on July 22, 1991, which is the instant Petition. On October 4, 1991. DCYS refiled termination petitions on Carlos' two siblings, but on January 30, 1992, the Court reopened the disposition of commitment to DCYS of Carlos' two siblings and transferred their guardianship to their maternal grandparents in Puerto Rico, where they had been living since November 30, 1991.
III. WITNESSES AND EXHIBITS
A. Adjudicatory Phase
The Petitioner called the following witnesses:
Dr. Fernando Stern, Psychiatrist; Helio Mendonca of DCYS; Dr. Miguel Suarez, Psychologist; Nelida Perez of DCYS; Guadalupe Pillars of DCYS; Dr. John Lee, Pediatrician; Connie Burk-Buckler of DCYS; Fernando Rausch of DCYS; and Ruth Waugh, Foster Mother. Neither parent nor the child called any witnesses. The Petitioner put into evidence eight exhibits; these were the only exhibits.
B. Dispositive Phase
The Petitioner called the following witnesses: Ruth Waugh, Foster Mother; Dr. Fernando Stern, Psychiatrist and Fernando Rausch of DCYS. Neither parent nor the child called any witnesses.
Maternal Grandparents called as witnesses Nelida Perez of DCYS and Catina Caban-Owen, Social Worker. CT Page 6326
Exhibits 1, 3, 7 and 8 from the Adjudicatory Phase of this trial were made exhibits in the Dispositional Phase, and Maternal Grandparents introduced into evidence three exhibits.
IV. FACTS
Evidence offered at trial, interpreted in the light of the prior record in this Court concerning this child, permits the finding of the following facts:
Carlos A. was born on August 22, 1989, and on that day Patty Long, a registered nurse at Windham Hospital, called DCYS and reported that Carlos had tested positive for cocaine. The parents refused to sign a voluntary placement form, so DCYS invoked a 96-hour hold, and on August 24, 1989 obtained an Order of Temporary Custody from the Court. Carlos was placed in a foster home in Putnam, but had to re-enter the hospital on September 6, 1989 because he was having difficulty breathing. On September 13, 1989, he went to live in the foster home of Ruth Waugh in Coventry, Connecticut, where he has lived ever since.
(Petitioner's Exhibit 7, Pages 3 and 4)
On September 7, 1989, Nelida Perez, DCYS Social Worker, met with Mother and Father, and told them that the goal of DCYS was reunification of Carlos and them. An Agreement was explained, discussed and signed by Mother, Father and Nelida Perez on September 7, 1989. The Agreement provided that Mother and Father would go for a drug evaluation at New Perceptions and would visit Carlos at least once a week. However, Mother and Father visited Carlos only six times in the twenty-one weeks between September 16, 1989 and February 14, 1990. On September 15, 1989, they both went to an intake visit at New Perceptions and an appointment was scheduled for evaluation on September 28, 1989, but neither parent showed up on that date or ever again. During this period Mother and Father were living in the Hooker Hotel in Willimantic, Connecticut, which is a very dangerous place frequented by drug users.
On November 2, 1989, when Carlos was adjudicated as neglected, guardianship of Carlos and his two siblings was transferred to his maternal grandparents in Puerto Rico, but they did not come to get the three children. On February 1, 1990, the transfer of guardianship to grandparents was revoked and they were committed to DCYS on February 1, 1990. Ms. Perez tried unsuccessfully to reach CT Page 6327 parents at the Hooker Hotel; she left her card and sent two letters. As of February 23, 1990, when the DCYS case was transferred from Ms. Perez to Guadalupe Pillars, parents had no housing or employment, no drug treatment, hadn't told Ms. Perez of their whereabouts, and hadn't contacted her since she had last seen them in court on November 2, 1989. On November 3, 1989, Ms. Perez told maternal grandfather that the Court had awarded him guardianship. On November 24, 1989 he called DCYS and said he would be in Connecticut on November 27, 1989 to get the children. On November 27, 1989 he called from Connecticut and Ms. Perez told him he would need papers to get the children. DCYS didn't hear from him again until February 6, 1990, after the children had been committed to DCYS. Ruth Waugh, Foster Mother, gave Mother and Father every opportunity to visit Carlos. He was very bonded to Ruth Waugh.
(Testimony of Nelida Perez)
From February 23, 1990 to June 13, 1991, Guadalupe Pillars was the DCYS treatment worker in this case; she is fluent in Spanish and English. On April 24, 1990, she told both Mother and Father that they had not complied with their Agreement of September 7, 1989. On April 24, 1990, Mother, Father and Guadalupe Pillars signed a new Service Agreement (Petitioner's Exhibit 5), the duration of which was from April 24 to July 24, 1990. Its goal was reunification. On September 20, 1990, Mother, Father and Guadalupe Pillars signed a new Service Agreement (Petitioner's Exhibit 6), after Ms. Pillars consulted with their therapist, for an indefinite period, the goal of which was reunification in a "safe, nurturing, drug free environment." Mother and Father did not comply with either of these Service Agreements. They drifted from residence to residence without informing DCYS; they didn't follow through with drug treatment or testing, and they visited Carlos infrequently, although Ruth Waugh would have let them see him whenever they wanted. In the sixteen months between February 1990 and June 1991, Mother and Father visited him together thirteen times and Father visited alone three times. Mother's last visit during this period was January 8, 1991. DCYS set up these visits, arranged transportation or offered mileage. On many occasions, Mother and Father failed to show up for drug screenings. When they told Guadalupe Pillars they were having financial difficulties, she referred them to Town Welfare. She repeatedly warned Mother and Father that they were not following through and would have to start, and if they didn't comply, DCYS would seek to terminate their parental rights. Guadalupe Pillars attended most visits and observed that Carlos didn't recognize either parent; during CT Page 6328 visits he mostly played by himself.
(Testimony of Guadalupe Pillars)
On June 14, 1991, Fernando Rausch became the DCYS case worker in this matter. Dr. Suarez testified that on April 22, 1991 he felt that to allow the parents more than three months to comply with drug counseling and treatment and visitation with Carlos, would be psychologically detrimental to Carlos. On July 18, 1991, both Mother and Father became incarcerated; Mother for Drug Possession. Father had been charged with Drug Possession which would constitute a violation of the probation he was on. Mother had an appointment at United Services on June 19, 1991 and Father on June 21, 1991, for drug counseling and blood tests. Neither of them showed up. From June 14, 1991 until Mother and Father went to jail on July 18, 1991, neither visited Carlos at all. Father was released from jail in September 1991 and Mother on February 4, 1992. From his release from jail in September 1991, to January 23, 1992, Father visited Carlos only once. Ruth Waugh, Foster Mother, was agreeable to Mother and Father visiting at almost any time, but they seldom did.
(Testimony of Fernando Rausch)
Neither parent contacted Foster Mother for Carlos' birthday in August 1991. She has five other children, all of whom view him as their brother, and he sees them in the same way. Mrs. Waugh wants to adopt him; he's friendly and secure with her.
V. EXPERT TESTIMONY
Dr. Fernando Stern, Psychiatrist, who evaluated Mother, Father, Ruth Waugh, Carlos and Luis DeJesus on November 27, 1991, testified that fortunately for Carlos, Mrs. Waugh is his real mother and she loves and adores him, as he does her. Carlos has a warm, close, excellent bond with her, and it would be highly traumatic for him to move to Puerto Rico with his grandparents. It would not be in Carlos' best interest to break his bond with Ruth Waugh; it would cause him to lose trust. From Carlos' perspective, leaving Ruth Waugh would mean a loss of a parent with long-term effects such as chronic depression. It is highly probable this separation would be difficult for Carlos, perhaps for his whole life. Bonding is possible with his parents if they would settle down, grow up and provide a safe, secure home; but too much time would be lost for Carlos, which shouldn't be allowed; he cannot wait any CT Page 6329 longer. An important factor is that Carlos has been in a warm, caring home all his life and he is "perfect, a great child, very friendly and very close to his foster mother."
(Testimony of Dr. Stern)
Dr. Suarez testified that there is no bond between Carlos and his parents, not even any feelings or memories of them. He did a parent-child evaluation on April 1 and April 10, 1991, and felt that to allow more than three months for the parents to comply with drug treatment and visitation agreements would be psychologically detrimental to Carlos.
(Testimony of Dr. Suarez)
Dr. Suarez stated in his report of April 1991, that Carlos has a parental bond with both foster parents (Petitioner's Exhibit 3, Pages 23, 24).
VI. LAW AND STANDARD OF PROOF
The requirements for the termination of parental rights pursuant to General Statutes 17a-112 (b) are two-fold. The court must find by clear and convincing evidence that such termination is in the best interest of the child, and that one or more of the statutory grounds for termination exist. DCYS need only prove by clear and convincing evidence one of the statutory grounds provided in Section 17a-112 (b). Thus, if but one of the statutory grounds alleged in the petition in the present case was proved by clear and convincing evidence, and if, by that same standard, termination is in the best interest of the child, the petition should be granted (if the court waives the one year requirement where appropriate). See In re Nicolina T.,9 Conn. App. 598, 602 (1987).
VII. ADJUDICATION
A. Abandonment (Section 17a-112 (b)(1)
The evidence is clear and convincing that both Mother and Father, as of January 30, 1992, the day the Petition was last amended, have abandoned Carlos in the statutory (17a-112 (b)(1) sense of failing "to maintain a reasonable degree of interest, concern, or responsibility as to" his welfare.
During the one year period preceding January 30, 1992 (January 29, 1991 — January 30, 1992), Father visited Carlos once in February, once in March, once in May and once in CT Page 6330 December. Mother visited him not at all. During this one year period Father was in jail only from July 18, 1991 to some time in September 1991 so that cannot be used as an excuse. Mother was in jail from July 18, 1991 to early February 1992, but inasmuch as she didn't visit Carlos at all during the period from January 30, 1991 to July 18, 1991, it cannot reasonably be argued that her incarceration was a factor in her not visiting. DCYS offered mileage reimbursement, but the parents never asked for this. The foster mother would have permitted visitation at virtually any time.
The Court finds that the parents have in effect ignored Carlos; their own interest have clearly left little or no room in their lives for him, hence, the Petitioner has proved clearly and convincingly that both Mother and Father have abandoned Carlos. The court also finds that this abandonment existed for at least one year prior to January 30, 1992, and that even if it hadn't, the one year requirement should be waived in Carlos' best interest. The record is clear that Mother and Father's interest in Carlos has waned rather than waxed, so allowing more time holds little or no hope for change for the better.
B. Failure to Rehabilitate (Section 17a-112 (b)(2)
This statutory ground requires the Court to look at Carlos' situation with his Parents on the date he was adjudicated neglected (November 2, 1989), the date he was committed to DCYS (February 1, 1990), and the adjudicatory date for the Petition (January 30, 1992), and to then determine whether the changes, if any, in the Parents' lives, "would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in the life of the child."
Carlos was born on August 22, 1989, and on that date his urine tested positive for cocaine. Mother and Father signed Agreements with DCYS on September 7, 1989, April 24, 1990 and September 20, 1990 and Father alone signed another Agreement on June 13, 1991. These Agreements all made reference to the need for both Mother and Father to address their drug abuse problems. The record in this case is clear that both failed abysmally to make any real effort to even attempt to eliminate drugs from their lives. They were fully aware that failure would probably lead to termination of their parental rights in Carlos; even that wasn't enough for them to do anything about it. It is difficult enough to eliminate a drug problem under any circumstances; it is well nigh impossible to be rehabilitated if a person refuses to try. Mother and Father failed to live up to their Agreements CT Page 6331 in other ways; they failed to obtain stable housing and in fact lived for a time with two other children in a drug-infested hotel, and they failed to visit Carlos on a consistent basis, to the point that in the last year, the visits tailed off to practically none.
A good indication of Parents' lack of progress is that in July 1991, both were incarcerated on drug-related charges Both Mother and Father have been going backward on the road to rehabilitation, so there is no point in allowing them any further time to assume a reasonable position in Carlos' life.
The Court finds that the Petitioner has clearly and convincingly proved the Failure to Rehabilitate ground, and that it has existed for not less than one year.
C. Acts of Omission or Commission (Sec. 17a-112 (b)(3)
In order to terminate parental rights on the ground of acts of commission or omission under Section 17a-112 (b)(3), the Court must clearly and convincingly find that "the child has been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well-being." The fact that Mother and Father have not themselves provided those needs doesn't mean that Carlos has been deprived of them. In fact, the opposite is true. His foster home has more than adequately cared for him for his whole life. He sees Mrs. Waugh as his parent and caregiver, and has thrived under her care and concern.
The Court finds that the Petitioner has not proved this ground by clear and convincing evidence and therefore dismisses this ground.
D. No Ongoing Parent-Child Relationship (Sec. 17a-112(b)(4))
Section 17a-112 (b)(4) defines this ground as:
 "there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of-the child."
CT Page 6332
The fact that there has been some contact between Carlos and his parents from the time custody was taken from them on August 24, 1989 and January 30, 1992, "does not preclude a determination that there has been no ongoing parent-child relationship. " In re Juvenile Appeal, (Anonymous), 181 Conn. 638, 646 (1980).
Both Dr. Stern and Dr. Suarez found little or no evidence of any bond between Carlos and his parents; Dr. Suarez on April 1991, and Dr. Stern on November 1991. Carlos does not recognize either of them as a parent, shows little positive reaction to their presence. The fact that Father was in jail from July to September 1991, and Mother was in jail from July 1991 to February 1992 is not an important consideration because Mother hadn't been visiting prior to her incarceration and Father's visits from the time Dr. Suarez saw Carlos and him in April 1991 and January 30, 1992, were very few (he was incarcerated for only two month in this period). Mother and Father could have visited Carlos virtually any time they pleased; Foster Mother had an open visitation policy. Carlos was two years and five months old on January 30, 1992, and had been in foster care his entire life. His parents have made no measurable progress in forming a relationship with him, and they have not made any personal progress in making themselves able to care for him. There is no basis to believe that this will change in the foreseeable future. Carlos should not have to wait any longer to determine whether his parents will ever be able to fill parental roles. The Court finds by clear and convincing evidence that no parent-child relationship exists and to allow further time for it to develop would be detrimental to Carlos' best interest. Inasmuch as neither parent is making any progress whatsoever, there is no point in waiting, and therefore the Court finds from the totality of the circumstances surrounding Carlos, that if this ground has existed for less than a year, a waiver of the requirement that one year expire prior to the termination of parental rights is necessary to promote the best interest of Carlos.
VIII. DISPOSITION
Having found that the petitioner has established by clear and convincing proof three of the four grounds alleged for termination, and that a waiver of the one year requirement as to grounds one and four is in the best interest of the child, the Court now proceeds with the dispositive phase. Proof of one or more of the statutory grounds does not bring forth orders of termination automatically. To warrant a destruction of the parent-child relationship, the Court must also find from clear and convincing evidence that termination of CT Page 6333 parental rights is in the best interest of the child. In Re Nicolina T., 9 Conn. App. 598, 602 (1987).
Dr. Miguel Suarez's recommendation, after his psychological evaluations of Carlos and his parents in April 1991 was:
 "With regard to Carlos, given the fact that he is still very young, it is not too late for bonding to be established with his biological parents with frequent visitations. However, if the parents continue not to comply with both treat [treatment] and visitations on a frequent basis, termination of parental rights should be considered."
The fact is that the parents did not obtain treatment, nor did they visit Carlos frequently. Dr. Fernando Stern's opinion, after his November 27, 1991 psychiatric evaluations of Carlos, his biological parents, his Maternal Grandfather his Father and Foster Mother, Ruth W., was as follows:
 "Undoubtedly Carlos has developed a very positive, healthy and appropriate binding to whom he considers to be his mother, Ms. W., and it might be too late for him to develop this bond with his biological mother and or maternal grandparents in view that Carlos appears to have bonded so healthily with Ms. Waugh and with his foster siblings, it would be in his best interest for him to stay in his present placement and to make this placement definite and not temporary. . . . Interruption of this stable, loving environment is absolutely contraindicated."
 "Mr. Alers . . . does not, at this moment in time, appear to be an appropriate candidate for fathering Carlos."
 "Although it is always possible that Ms. DeJesus and Mr. Alers can conquer their problems and `straighten out,' I feel that this will take a while and the mental and psychological health of Carlos will be impaired if the system does not make a decision as soon as possible as to his permanent placement and custody. Aware of the social and sociological issues CT Page 6334 involved, it is my recommendation that Carlos remain in the custody of Ms. W., and that Ms. W. be allowed to proceed in her adoption of the child."
Psychological testimony from professionals is rightly accorded great weight in termination proceedings. In re Nicolina T., 9 Conn. App. 598, 605 (1987).
The Maternal Grandparents, Louis R. DeJesus and Matilde A. Arroyo, were allowed to intervene as parties in the Dispositive Phase of this case, and they are seeking placement of Carlos with them, in Puerto Rico, to join his brother and sister, who were placed there by this Court. They argue in their Memorandum of Law filed with the Court that it is not in Carlos' best interest that the parental rights of his parents be terminated, and therefore ask that this Petition be dismissed and Carlos placed with them, his maternal grandparents. However, Dr. Stern has recommended that Carlos not go to Puerto Rico. Dr. Stern testified that it would be highly traumatic for at least a year for Carlos to move to Puerto Rico with his grandparents, and it is not in his best interest to break his warm, close, excellent bond with his Foster Mother, who wants to adopt him. Dr. Stern also testified that if Carlos were to leave his foster home, it would mean the loss of his parents, who really are his Foster Parents; and this could have long-term effects on him, such as chronic depression, and that it is highly probable that this would be difficult for him, maybe for life.
By the express language of Section 17a-112 (d) of the Conn. General Statutes, the Court, in determining whether to terminate parental rights, shall consider and make written findings regarding the six factors enumerated therein. The Court hereby sets forth written findings on those factors.
SIX REQUIRED FINDINGS
1. Numerous services have been offered to the Parents from the date of Carlos' birth to January 30, 1992, in an effort to reunite them with him. Included among these services were preparing agreements to assist parents in progressing toward reunification, arranging for parental visits, offering mileage for visits, keeping in touch with Foster Mother, contacting providers of drug evaluation and screening, monitoring progress, making referrals to agencies, providing Spanish speaking social workers, attempting to contact parents to keep them informed.
2. On August 31, 1989, at a Court Hearing, Judge CT Page 6335 Potter accepted Parents' agreement to comply with DCYS expectations for drug-testing. Neither abided by this, even though DCYS set up appointments for this to be done. Court orders for psychological and psychiatric evaluations were carried out.
3. Carlos has little or no feelings and emotional ties with his Parents, and very close ties and bonding with his foster mother, with whom he has lived since he was about three weeks old.
4. Carlos was born on August 22, 1989, so on January 30, 1992 he was almost two and a half years old.
5. Neither Parent has made any reasonable effort to do anything to make it in Carlos' best interest to return home in the foreseeable future. They have not made regular contact with him, particularly since January 1991, nor with his Foster Mother.
6. Mother and Father's lack of a meaningful relationship with Carlos has been caused by their own deficiencies and unwillingness or inability to do anything about them, and not by the unreasonable act of any other persons or by their economic circumstances.
Having considered the foregoing, it is both clear and convincing that Carlos' best interest will be served only if his Parents' parental rights are terminated so that he may be placed in the security of adoption without further delay. The Court finds that it would not be in Carlos' best interest to go to Puerto Rico to live with his Maternal Grandparents, and in light of this finding, it is not necessary for the Court to address any further the issues raised in the Memorandum of Law submitted in their behalf.
Therefore, it is ORDERED that the parental rights of Lizette D. and Edwin A. to Carlos A. be and are hereby terminated, and IT IS FURTHER ORDERED that the Commissioner of DCYS be appointed statutory parent for the purpose of placing Carlos in adoption and that DCYS should submit to this Court, in writing, no later than 90 days following the date of this judgment, a report of the progress toward such adoption, and thereafter in such forms and at such intervals as this court from time to time may require.
IX. APPEAL
The parties have 20 days from the date of this judgment in which to take an appeal. Practice Book 4009. CT Page 6336 If an appeal is requested and trial counsel is willing to continue representation, this Court will appoint that attorney to act as appellate counsel, at at public expense, if the appellant is indigent, until all appellate process is completed. Practice Book 4017. If, however in the exercise of professional judgment as an officer of the Superior Court, the attorney declines to perfect such appeal because, in the attorney's opinion, it lacks merit, the attorney is not required to do so but may instead simultaneously file a timely motion to withdraw and another motion to extend the appellate period to the full maximum of 40 days as permitted by law. Practice Book 4040. Such motions, if unopposed, will be granted ex parte and a new attorney appointed to review this record and make an independent determination of the merits of such appeal. If the second attorney determines it lacks merit, the reason for this opinion shall be promptly submitted to the court in writing. The party seeking the appeal will then be informed by the Court Clerk that the party has the balance of the 40 days in which to secure counsel for the purpose of taking such appeal, who may, if qualified, be appointed by the court to be compensated by the state. Douglas v. California, 372 U.S. 353 (1963); Fredericks v. Reincke,152 Conn. 501 (1965).
If such procedure satisfies the sixth amendment right to counsel in a criminal proceeding, it is a fortiori appropriate where there are interests of a third party involved: those of the child whose interest in achieving permanent nurturing parents without unnecessary delay is entitled to at least as great a degree of consideration as those of the parent whose right to raise the child is at issue. Even an unsuccessful appeal could delay permanent planning for years since no child may be adopted until the appellate process is exhausted.
Entered at Willimantic this 2nd day of July, 1992.
Richard A. Walsh, J. CT Page 6337