Memorandum of Decision
On January 7, 1997, the Department of Children and Families (DCF) filed petitions to terminate the parental rights of Tracey V. and Eric H., Sr., to their children, Eric H., Jr., Alphonso H., and Leon V. A consolidated trial of these petitions took place on January 20 and 26, 1999. For the reasons stated below, the Court grants the petition to terminate parental rights.
FACTS
The Court finds the following facts and credits the following evidence.
A. The parents
Tracey V. has had five children, starting with LaToya in 1986. In 1990, DCF first became involved with LaToya. She is now in the guardianship of her maternal grandmother.
Eric H., Sr., while legally married to another woman, was the father of Tracey's next three children: Eric, Jr., born on April 1, 1991; Alphonso, on August 1, 1993; and Leon, on November 2, 1994. At birth Leon tested positive for cocaine and cannabis. The mother admitted using marijuana prior to delivery but denied using cocaine. On November 16, 1994, the court adjudicated Eric and Alphonso neglected or uncared for and placed them with the mother under DCF's protective supervision. The court imposed CT Page 1225 expectations for the parents to follow at that time.
On April 4, 1995, DCF obtained an order of temporary custody of all three boys based on allegations that the boys were living in an unclean, attic apartment with inadequate sleeping provisions and no stove, refrigerator, or bathroom. Alphonso and Leon went to one foster home and Eric went to a separate one. Shortly thereafter, the court adjudicated Leon to be neglected and committed all three boys to DCF custody for a period of eighteen months. The court has regularly extended this commitment thereafter.
Visits with the children at the DCF office began in April, 1995. At first, the parents were often late or absent. When they were there, they would argue between themselves or with the DCF workers. The parents did not consistently interact with the children but instead seemed more concerned with their own concerns. The children were glad to see each other but somewhat chaotic in behavior.
The mother attended eleven out of eighteen scheduled visits and then ceased visiting in February, 1996. At that time she stated that if she could not have the children permanently, she did not want to see them at all. She also told DCF that, if it kept taking them, she "would keep making them."
In January, 1996, the mother gave birth to a boy named Travis and DCF became involved in his case. After signing service agreements with DCF, the mother refused to cooperate with DCF home visits, with counseling arranged by DCF, or with DCF's request for a psychological examination. When the mother did meet with DCF, she would often act in a volatile manner or ramble incoherently. She accused DCF of placing her children in "bondage" and characterized their foster care placements as "jail." In June 1996, the mother finally agreed to a drug test and the results came out positive for cocaine. When the DCF caseworker hand-delivered the results to the mother, the mother ripped them up, accused the caseworker of falsifying them, and threatened to assault the caseworker.
The mother's whereabouts then became unknown to DCF until November, 1997.[2] When she returned, she called DCF to request food for Travis, but did not mention her other children. Later that month, the mother asked DCF to resume scheduling visitation with her children. DCF advised the mother to request visitation CT Page 1226 at an extension hearing scheduled for December 12, 1997. Although both parents attended that extension hearing, neither requested visitation.
The father testified at trial. He is forty-nine years old and has a total of eleven children. He remains legally married to, although apparently estranged from, his wife of twenty-eight years. The father has maintained steady employment, most recently as a sales assistant at Lord Taylor, and claims to pay child support for seven of his children. He now lives with his mother, but still frequents Tracey's attic apartment. Over the years, he and Tracey have gotten into numerous arguments and several fights, resulting in his arrest on two occasions. The father does not use drugs or cigarettes, and rarely drinks.
The father's attendance at visits ultimately declined to the point that he did not visit at all between December, 1996, and April, 1997. The father testified that he was focusing on getting a job during this period. In total, the father attended twenty-two out of thirty-one scheduled visits with his children between April, 1995 and September, 1997. The father claimed in general that his work schedule did not always allow him to attend the visits or to call DCF to set them up. The father refused to take a drug test, to enroll in counseling, or to submit to a psychological evaluation, claiming that the acts of doing so would stigmatize him. He has been confrontational and volatile with DCF workers.
From January 1998 on, DCF opposed further visitation by either parent and advised the parents that they would have to file a court motion to obtain visitation. Neither parent did. With the exception of one birthday card sent to Eric by the father, the parents have not recognized their children's birthdays or Christmas, sent them cards or gifts, or requested pictures of them since they came into foster care. The mother failed to appear in court on January 19, 1999, the day this case was originally scheduled for trial, because she had been arrested the night before for assault. The father also failed to appear in court on that day.
B. The Children
DCF placed Eric in approximately six different homes between April 1995, when he was originally removed from his parents, and July 1997. Eric's behavior was a persistent problem. At the May CT Page 1227 8, 1997 visit with his brothers and his father, Eric was agitated and hysterical. The father responded inappropriately to this problem. Five days later, Eric's therapist recommended suspension of visitation. When informed of this decision in July, 1997, the father argued with the DCF worker and challenged the therapist's recommendation, rather than explore ways to improve the situation.
DCF placed Eric with a single foster father in July 1997. Eric was hospitalized in March, 1998 with diagnoses of post traumatic stress disorder, attention deficit disorder, and impulse control disorder. He also exhibited sexually inappropriate behavior. The foster father, however, has been very consistent with Eric and Eric's adverse behaviors have diminished. Eric receives therapy several times a week. His foster father is very involved in the therapy and in Eric's therapeutic education program. Eric has now become bonded to his foster father, is quite proud of him, and calls him "Dad." Eric's recollections of his natural parents focus on them fighting and arguing and Eric not feeling safe. Eric also exhibits sexual stimulation when talking about his mother.
Alphonso and Leon have remained in the same placement, which consists of a single foster mother, since April, 1995. They have bonded to their foster mother and enjoy the neighborhood where they live. They are doing well in school and have a normal, happy demeanor. Since April 1995, they have seen their natural mother for a total of eleven hours, all which occurred before the end of February, 1996, and have seen their natural father for a total of twenty-two hours, all of which occurred before the end of July, 1997.[3] At the April 3, 1997 visit, which was the father's first since December 11, 1996, Leon did not recognize his natural father and Alphonso and Eric were visibly upset. Prior to their last visit on July 31, 1997, Alphonso initially refused to see his natural father.
ADJUDICATION
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification CT Page 1228 efforts." Conn. Gen. Stat. § 17a-112(c)(1). In this case, DCF offered the parents visitation with their sons, counseling, especially for parenting issues, psychological and substance abuse evaluations, and aftercare services. The court finds that these services constitute reasonable efforts to reunify the parents and children and that, in any event, as discussed above, the parents were unwilling to benefit from them.
B. Statutory Grounds
To prevail in a nonconsensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See Inre Michael B., 49 Conn. App. 510, 512 (1998); Conn. Gen. Stat. § 17a-112(c)(3). General Statutes § 17a-112(c)(3) requires that, with one exception not pertinent here, these grounds must have existed for at least one year unless the Court waives the one year requirement based on the standards set forth in § 17a-112(d).[4] In this adjudicatory phase, the Court is limited to events preceding the filing of the petition or the latest amendment. See Practice Book § 33-3(a). Because DCF obtained an amendment of the complaint on September 4, 1998, that date becomes the adjudicatory date.
DCF has alleged the grounds of abandonment, failure to rehabilitate, and lack of an ongoing parent-child relationship against both parents. DCF alleges that these grounds have existed for more than one year. The Court finds that DCF has proven all three grounds against both parents by clear and convincing evidence.
1. Abandonment
General Statutes § 17a-1 12(c)(3)(A) provides that a ground for termination exists when "[t]he child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child." "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of the child." In reMigdalia M., 6 Conn. App. 194, 208-209, cert. denied,199 Conn. 809 (1986). Conversely, "where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, and no concern for the CT Page 1229 child's welfare, statutory abandonment has occurred." Id. at 209. The statutory term "maintain" implies a "continuing, reasonable degree of concern." Id. at 210.
Both parents have abandoned Eric, Jr., Alphonso, and Leon. Even in 1995 and 1996, when the parents were visiting their children, the parents were inconsistent, late, and occasionally disinterested. The mother stopped seeing her children altogether in February, 1996; the father, in September, 1997. Although the parents cannot readily see their children now even if they wanted to do so, because DCF now opposes further visitation, that position is reasonably based on the parents' lack of interest over the past several years. With one small exception, the parents have not recognized their children's birthdays or Christmas, sent them cards or gifts, or requested pictures of them since they came into foster care. This evidence clearly and convincingly establishes abandonment by both parents.
2. Failure to Rehabilitate
A second statutory ground for termination arises when "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112(c)(3)(B). No dispute exists that the Court has previously found the children to have been "neglected," thus satisfying a statutory prerequisite.
The rest of the statute requires the Court to find whether the facts "encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112(c)(3)(B). This portion of the statute requires the Court to analyze a parent's rehabilitation "as it relates to the needs of the particular child" and determine whether such rehabilitation is foreseeable "within a reasonable time." In re Luis C., 210 Conn. 157, 167 (1989). The statute, however, does not require parents "to be able to assume full responsibility for a child, without the use of available support programs." In re Jessica M., 49 Conn. App. 229, 240 (1998) (internal citation omitted). Because of the requirement that the Court predict what will happen within a "reasonable time" after CT Page 1230 the filing of the termination petition, it is sensible to conclude that the Court can consider not only the parents' conduct before the filing of the termination petition, but also the conduct occurring after it.
In the mother's case, there is perhaps no better proof of her failure to rehabilitate than her arrest on the eve of trial. There is, of course, much more than that. The mother refuses to acknowledge her drug problem. She unreasonably resisted the other help and services that DCF offered her. She disappeared for over a year, thus severing the few bonds that remained with her children. She still does not have housing suitable for a large family. She has a defiant attitude that resists rehabilitation.
The father's denial of a need for help or even an evaluation does not encourage this court to believe that he would have the type of understanding and cooperation necessary to work with DCF in regaining his children. Although the evidence reveals that the father does not use illegal drugs, the fact of the matter is that, in today's world, many-people have to undergo drug testing to obtain positions of responsibility. The father is not exempt from this approach. His desire to work is commendable, but as a parent he must both maintain a job and maintain a relationship with his children. The father was unable to do that. His unstable relationship with the mother has resulted in several arrests and he does not appear to have addressed that problem. He, too, has not established adequate housing for a family with three boys. His failure to appear in court for the first scheduled day of trial sends the wrong signal to this court. For all these reasons, DCF has proven by clear and convincing evidence that both parents have failed to rehabilitate.
3. No Ongoing Relationship
DCF also alleges that there is no ongoing parent-child relationship between the boys an and the parents. To prove this ground, DCF must show the absence of "the relationship that develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and [that] to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." General Statutes § 17a-112(c)(3)(D). This ground encompasses a situation in which "regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between CT Page 1231 them, or has definitely lost that relationship, so that despite its former existence it has now been completely displaced." In reJuvenile Appeal (Anonymous), 181 Conn. 638, 645 (1980) (internal citation omitted) The decisive question is "whether the child has no present memories or feelings for the natural parent." Id. at 646.
The evidence is clear and convincing that the boys have no positive feelings for Tracey and Eric, Sr., as parents. The boys have been out of their natural parents' home since April, 1995. They stopped seeing their mother altogether in February, 1996. After showing lack of recognition of their father or resistance to seeing him, visits with the father ended in 1997. Instead, the boys have bonded with their respective foster parents. The court finds that the parents have no ongoing parent-child relationship with Eric, Jr., Alphonso, or Leon.
DISPOSITION
In the dispositional phase of a termination case, the Court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." Conn. Gen. Stat. § 17a-112(c)(2). The Court can consider all events occurring through the close of the dispositional hearing. Practice Book § 33-5.
The best interest of Eric, Jr., Alphonso, and Leon clearly and convincingly favors termination of the parental rights of their parents, Tracey V. and Eric H., Sr. The parents have shown only sporadic interest in their children over the years. They have not rehabilitated themselves to the point that would inspire confidence in their ability to provide stability and guidance in their children's lives. There is no ongoing parent-child relationship. The children are doing well in their respective foster homes and have become attached to their foster parents. Eric, Jr., has special needs that his foster father, who he calls "Dad," is addressing conscientiously. All three children would benefit from the permanency that termination provides.
In arriving at a decision, the Court must consider and make written findings regarding seven factors set out in General Statutes § 17a-112(e). See In re Tabitha P.,39 Conn. App. 353, 362 (1995). A discussion of these factors follows.
1) The timeliness, nature and extent of services offered, CT Page 1232 provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
Based on the foregoing discussion, the Court finds that DCF provided foster care for the children, arranged for visitation with the parents, and offered a variety of evaluations and services. These services were relevant to the needs of the parties and offered in a timely manner.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
Based on the foregoing discussion, the Court finds that DCF has made reasonable efforts to reunify the family, but that the parents have been disinterested or uncooperative.
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
On or about November 16, 1996, the Court approved the following expectations for Tracey V. and Eric H., Sr.: (1) keep all appointments set by or with DCF, keep whereabouts known to DCF and your attorney, and allow announced and unannounced home visits by DCF, (2) visit the children as often as DCF permits, (3) participate in counseling such as parent-aide services, parent support groups, and drug and alcohol counseling, (4) complete a substance abuse evaluation and follow all recommendations (mother only),[5] 5) Eric, Jr. was to attend Head Start if transportation became available, (6) secure and maintain adequate housing and income, (7) no substance abuse, (8) no further involvement with the criminal justice system, and (9) (for the mother) make and keep all medical appointments for herself and her children. The mother complied in some minimal respects by initially accepting services such as the visiting nurse's association and by eventually submitting to a drug test, but, on the whole, the mother's compliance, as discussed, was poor. The father has apparently remained free of substance abuse, but in other respects has not complied with the expectations. DCF has honored its agreement to facilitate visitation and provide services.
4) The feelings and emotional ties of the child with respect CT Page 1233 to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
As stated above, the children are bonded to their foster parents. The children do not view Tracey V. and Eric H., Sr., as their parents.
5) The age of the child.
Eric, Jr., is almost eight years old. Alphonso is five and one-half years old. Leon is four years old.
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interests of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the Court finds that the parents have not made sufficient efforts to adjust their circumstances or to maintain visitation with their children so as to facilitate reunification.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
The parents here did not face unreasonable interference from each other, from any third persons, or from economic circumstances. The father argued that he faced unreasonable interference from the mother, but it was the father who was arrested for domestic violence on two occasions. Moreover, the mother clearly did not interfere with the father's opportunity to visit the boys in the latter part of 1996 and in 1997, because the mother's whereabouts were unknown during this time. The parents' predicament is a consequence of their own actions. CT Page 1234
CONCLUSION
Based upon the foregoing findings, the Court determines that it is in the best interest of Eric H., Jr., Alphonso H., and Leon V. for a termination of parental rights to enter with respect to the mother, Tracey V., and the father, Eric H., Sr. Accordingly, the Court hereby grants the petitions to terminate the parental rights of Tracey V. and Eric H., Sr. The Court further orders that the Commissioner of DCF is appointed statutory parent for Eric, Jr., Alphonso, and Leon for the purpose of securing an adoptive family. The Commissioner shall file with this Court no later than ninety days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
It is so ordered.
_____________________ Carl J. Schuman Judge, Superior Court
[2] The mother did contact DCF several times during this period but, on each occasion that DCF scheduled a meeting as a result of that contact, the mother failed to show up.
[3] The actual totals are undoubtedly less than that stated in the text, because the parents were often late for visits.
[4] Effective July 1, 1998, section 8 of Public Act No. 98-241
eliminates the one year requirement.
[5] The father separately agreed to a substance abuse evaluation in July, 1996. It is not clear when DCF asked him to submit to a psychological evaluation.